SIGNATURE PHARMACY, INC.,
ROBERT STAN LOOMIS, KENNETH
MICHAEL LOOMIS, NAOMI LOOMIS,
KIRK CALVERT and TONY
PALLADINO,

Plaintiffs,

-vs-                                                  Case No.  6:08-cv-1853-Orl-31GJK

P. DAVID SOARES, CHRISTOPHER B.
BAYNES, ALBANY COUNTY DISTRICT
ATTORNEY'S OFFICE, MARK HASKINS,
CITY OF ORLANDO, FLORIDA and
ALEX WRIGHT,

Defendants.
_____

# ORDER

This matter came before the Court upon consideration of Defendant's, Alex Wright

("Wright"), Motion for Summary Judgment (the "Motion") (Doc. 129), Plaintiffs' response in

opposition thereto (Doc. 202), Defendant's reply (Doc. 221), and Plaintiffs' sur-replies (Docs. 230

and 250).  The Court heard oral argument and held an evidentiary hearing on May 19 and 21, 2010

(Doc. 257).

## I.  Overview

In November 2005, authorities began investigating Signature Pharmacy, Inc. ("Signature")

and its principals[1] for violations of federal and Florida statutes restricting the sale of anabolic

_____

[1]Signature is owned by Robert Stan Loomis ("Stan Loomis"), Naomi Loomis ("Naomi
Loomis"), and Kenneth Michael Loomis ("Kenneth Loomis").  Kirk Calvert ("Calvert") and Tony
Palladino ("Palladino") were employees of Signature.  Collectively, these individuals are referred to
herein as the "Plaintiffs."

steroids and human growth hormone.  The investigation was carried out by multiple federal and state law enforcement agencies[2] in Florida and New York and included, *inter alia*: a wiretap of Signature's phones; grand jury proceedings before a New York County Court; and search warrants authorized by a Florida Circuit Court.

The investigation came to a head on February 27, 2007, when agents in Florida executed three search warrants and arrested Signature's principals.  During the raids, which were highly publicized and conducted in the presence of the media, agents seized virtually everything on Signature's premises and "perp walked" certain Plaintiffs.  A week later, Plaintiffs were transported to Albany, New York for arraignment.

Despite the wiretap and seizure of voluminous amounts of physical and documentary evidence, Plaintiffs were never tried for any criminal wrongdoing.  All of the New York indictments were dismissed, the State of Florida formally declared that it would not prosecute, and the property seized during the search warrants was ordered to be returned to Signature.[3]

On September 24, 2008, Plaintiffs brought suit pursuant to 42 U.S.C. § 1983 [hereinafter, "§ 1983"].  (Doc. 3).

---

Signature operated two pharmacies in Central Florida: a traditional pharmacy located on Aloma Avenue in Winter Park and a compounding pharmacy located on Kuhl Avenue near downtown Orlando.  A compounding pharmacy creates customized medications for patients whose health care needs may not be met by manufactured medications (including, for example, patients who need specialized dosing or are allergic to inert ingredients such as binders or dyes in commercially available products).  International Academy of Compounding Pharmacists, What is Pharmacy Compounding?, http://www.iacprx.org/site/PageServer?pagename=What_is_ Compounding.

[2]The various agencies in the investigation included, among others, the Orlando Metropolitan Bureau of Investigation, U.S. Drug Enforcement Agency, Florida Department of Law Enforcement, U.S. Food and Drug Administration, Orlando Police Department, U.S. Internal Revenue Service, and New York Bureau of Narcotics Enforcement.

[3]Despite a court order, law enforcement has never returned Signature's property.

## II. Procedural Posture

Litigation arising out of or related to Signature has proceeded on multiple fronts.[4]  In this § 1983 action, Plaintiffs sued the City of Orlando ("City"); Wright, an employee of the Orlando Police Department ("OPD") and an agent with the Metropolitan Bureau of Investigation ("MBI");[5] the Albany County, New York District Attorney's Office and its district and assistant district attorneys, P. David Soares ("Soares") and Christopher B. Baynes ("Baynes"), respectively; and Mark Haskins ("Haskins"), a peace officer with the New York Bureau of Narcotics Enforcement (collectively, "Defendants").  To effectively manage this case, the Court has focused first on the Florida Defendants (the City and Wright)[6] and will address the

---

[4]Signature is currently litigating in at least three separate actions: (1) a civil State Court matter involving the evidence seized during the raids, which is pending before the Ninth Judicial Circuit Court, in and for Orange and Osceola Counties, Florida, *In re Matter of Search Warrant*, Case No. 2007-CA-1237 (Fla. Cir. Ct. 2007); (2) a miscellaneous federal matter concerning a motion to quash a federal grand jury subpoena and to return Signature's property, which is pending before this Court, *In re: Grand Jury No. 09-1*, Case No. 6:10-mc-38 (M.D. Fla. 2010); and (3) the instant § 1983 action.

In addition to the foregoing, between January 2007 and February 2008, four successive indictments against Signature's principals were returned by two grand juries in Albany County, New York.  All four indictments, however, were dismissed and the presentment of the fourth indictment, in particular, was "so improper as to impair the integrity of the grand jury" that the trial court denied the People of New York's motion for leave to re-present their charges to a new grand jury.  *People v. Loomis*, 896 N.Y.S.2d 208, 209 (N.Y. App. Div. 2010) (citations and quotations omitted).  On February 18, 2010, the New York appellate court affirmed and agreed with the trial court's findings, but as "a matter of discretion [and] in the interest of justice," modified the trial court's order "by reversing. . .[the denial of] the People's motion for leave to re-present the charges. . . ."  *Id.* at 211.  As of today, however, no charges appear to have been re-presented and it is unclear whether the statute of limitations would preclude a subsequent prosecution.

[5]"MBI is a multi-agency task force that brings together Federal, State and local law enforcement agencies to target . . . criminal enterprises" in Central Florida  (Doc. 246 at 2).

[6]The Court disposed of the claims against the City on June 4, 2010.  (Doc. 282).

claims against the remaining Defendants by separate order. This Order, in particular, concerns Plaintiffs' claims against Wright only.[7]

In their Amended Complaint, Plaintiffs assert five groups of claims against Wright.[8] Specifically, Plaintiffs allege that Wright: (1) illegally seized Plaintiffs' property without probable cause and outside the scope of any valid search warrant, in violation of the Fourth Amendment (the "Unlawful Seizure" claims). (Doc. 3, ¶¶ 30 and 119); (2) deprived Plaintiffs of their right not to be arrested or detained without probable cause, in violation of the Fourth Amendment (the "Unlawful Arrest" claim) (Doc. 3, ¶¶ 117-118); (3) caused Plaintiffs to be indicted without probable cause in violation of the Fourth and Fourteenth Amendments (the "Malicious Prosecution" claim) (Doc. 3, ¶ 120);[9] (4) engaged in a negative and false media campaign to destroy Plaintiffs' protected business interests in violation of the Fourteenth Amendment (the "Defamation" claim) (Doc. 3, ¶ 115);[10] and (5) conspired with Soares, Baynes and Haskins to violate their rights under the Fourth and Fourteenth Amendments (the "Unlawful Conspiracy" claim) (Doc. 3, ¶¶ 129-133).

---

[7]Plaintiffs have sued Wright in his individual capacity only. (Doc. 3, ¶7).

[8]The claims against Wright are not clearly delineated but appear in Count V (labeled simply "42 U.S.C. § 1983") and Count VI (labeled "42 U.S.C. §§ 1983 and 1985"). (Doc. 3, ¶¶ 110-128 and 129-141). Notwithstanding the reference to § 1985, Plaintiffs have represented to the Court that there is a scrivener's error in the Amended Complaint and that they had no intention of asserting a § 1985 claim. (Doc. 202 at 29, n. 22); (Doc. 201 at 15, n. 15).

[9]Plaintiffs' Malicious Prosecution claim is predicated solely on the proceedings in New York.

[10]The contours of Plaintiffs' Defamation Claim against Wright are far from clear. Construing the Amended Complaint in the light most favorable to Plaintiffs, the Court reads Count V as asserting a defamation claim that is separate and distinct from the claims asserted in Counts VIII and IX (which are not asserted against Wright).

In his Motion, Wright contends that he is entitled to qualified immunity on each of the foregoing claims.[11] Wright also argues that Plaintiffs had no reasonable expectation of privacy in Signature's stores and therefore lack standing to assert their Unlawful Seizure claims; that Plaintiffs have failed to adduce sufficient evidence in support of their Malicious Prosecution and Defamation claims; and that Plaintiffs have failed to allege their Unlawful Conspiracy claim with particularity. (Doc. 129 at 1-2). In addition, then, to qualified immunity, Wright contends that he is entitled to a judgment as a matter of law on Plaintiffs' Unlawful Seizure, Malicious Prosecution, Defamation and Unlawful Conspiracy claims.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

## II. Background[12]

In November 2005, the U.S. Drug Enforcement Agency (the "DEA") and Florida Office of Statewide Prosecutor Anne Wedge-McMillen ("Wedge-McMillen") approached MBI about assisting in their investigation of Signature (Doc. 247 at 1). MBI agreed to join the investigation and Wright was made the lead agent for the case.[13] (Doc. 247 at 1). Wright's initial investigation

---

[11]Wright also contends that: (1) he has absolute immunity with respect to his testimony before the grand jury; and (2) the claims of Stan Loomis and Tony Palladino must be dismissed for refusal to participate in discovery. (Doc. 129 at 1-2). However, inasmuch as Plaintiffs do not appear to assert (or have otherwise abandoned) any claim related to Wright's grand jury testimony, Wright's entitlement to absolute immunity is of no moment. As to the refusal to participate in discovery, the Court has already ruled that Defendants waived that defense by failing to timely move to compel Plaintiffs' testimony. (Doc. 140).

[12]Unless otherwise indicated, the material facts are largely not in dispute. Where there are disputes, however, the Court has construed the facts in the light most favorable to Plaintiffs. *See*, *e.g.*, *Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). Citations to the transcript of the hearing are cited to herein as "(Tr. at [page])."

[13]Officer Wright contends that he was overseen by, and received guidance from, Statewide Prosecutor Anne Wedge-McMillen, Florida's lead prosecutor in the Signature case. (Doc. 129-1). However, Wedge-McMillen testified, in part, that she did not maintain authority over Wright, did not necessarily tell Wright how to proceed, and did not know from whom Wright took his instructions. *See*, *e.g.*, (Doc. 129-13 at 18, Wedge-McMillen Dep. at 67-68).

consisted of pulling trash from Signature's dumpsters, interviewing Signature's customers, conducting undercover operations, and surveilling Signature's premises. (Doc. 247 at 3-4). From the outset, however, Wright's primary task was to prepare an affidavit in support of an application for a wiretap of Signature's phone and fax lines. (Doc. 247 at 2).

In May 2006, Wright attended a briefing given by the DEA in Dallas, Texas. (Doc. 247 at 3). At the briefing, Wright met Baynes and Haskins for the first time; they apparently had flown down from New York in connection with an unrelated case that involved the unlawful sale of prescription drugs. (Doc. 247 at 2-3). After learning that the DEA and MBI were attempting to build a case against Signature, Baynes and Haskins agreed to join the investigation. (Doc. 247 at 3). After the meeting, Wright, Baynes and Haskins agreed to share information about Signature on a weekly basis. (Doc. 246 at 3).

On August 4, 2006, Wright and Wedge-McMillen presented Wright's 144-page wiretap application, and probable cause affidavit in support thereof,[14] to the Honorable John Marshall Kest, a judge on the Ninth Circuit Court, in and for Orange and Osceola Counties, Florida (the "Florida State Court"). (Doc. 246 at 4 and Doc. 247 at 4). According to Plaintiffs, the wiretap application contained no fewer than 21 false or misleading material statements or omissions and, in the absence/presence of these statements, the application lacked probable cause and otherwise failed to comply with Florida law. (Doc. 247 at 4-8). The Florida State Court entered an order

---

[14]Wright was responsible for drafting the affidavit in support of the wiretap. (Doc. 246 at 4). According to Wright, however, the affidavit was "constantly reviewed by . . . Wedge-McMillen" and Wedge-McMillen "was responsible for ensuring that all other investigative means were exhausted before seeking the wiretap." (Doc. 246 at 4). Plaintiffs dispute the extent of Wedge-McMillen's supervision in reviewing the wiretap application and her testimony appears to cast some doubt on the extent of her role. (Doc. 129-13 at 19-20, Wedge-McMillen Dep. at 72-77).

approving the wiretap that same day and Signature's phone and fax lines were monitored for the next 60 days. (Doc. 129-10 at 17).

On September 25 and 26, 2006, Wright, Wedge-McMillen, Soares, Baynes, Haskins and others met at MBI's offices in Orlando to formulate a plan to take down Signature. (Doc. 247 at 8). At the meeting, Soares promised to "shut the operation down" and imprison anyone involved, (Doc. 184-3 at 26), and everyone agreed that:

> [A]lthough there [had] been a significant federal presence in the case . . . the case would be prosecuted and handled primarily by Florida and New York. The tentative plan would be for NY [to] prepare their Enterprise Corruption case and indict everyone involved. Shortly thereafter[,] when Florida [was] prepared to execute their search and seizure warrants . . . the indictments in the NYS case would be unsealed and everyone arrested and brought to New York. This would divide [Signature's] resources and force them to conduct two difficult cases on different fronts without any possibility of a double jeopardy issue because the case in New York would be based solely on acts committed in New York and not the [S]tate of Florida.

(Doc. 184-3 at 27-28).

In the fall of 2006, Defendants began a public relations campaign by attempting to connect Signature to professional athletes who were allegedly taking steroids and made deals with various media outlets to scoop the story. (Doc. 247 at 8). In December 2006, Wright and Haskins traveled to Pennsylvania and met with the Pittsburgh Steeler's team doctor.[15] (Doc. 247 at 8). That same month, Wright, Haskins and Baynes met with Brendon Lyons, a reporter with the Albany Times Union, and another reporter from Sports Illustrated, at Soares' office in Albany, New York. (Doc. 247 at 8-9). They agreed to give Lyons the scoop on the Signature case and the Albany Times Union later published its exclusive article minutes before the raids on Signature's premises. (Doc. 247 at 9).

---

[15]The meeting in Pittsburgh was subsequently reported on by EPSN, (Doc. 247 at 8), but it is unclear who leaked the details of the meeting.

For several weeks in the latter part of December 2006 and January 2007, Baynes appeared before a grand jury at the County Court in and for Albany County, New York (the "New York State Court"). *People v. Calvert*, No. 2-1311, slip op. at 2 (N.Y. Co. Ct. Sept. 11, 2008), *aff'd*, *in significant part*, *sub nom. People v. Loomis*, 896 N.Y.S.2d 208 (N.Y. App. Div. 2010); (Doc. 247 at 10). On January 25, 2007, the grand jury returned its first indictment against Stan Loomis, Naomi Loomis, Kenneth Loomis, Calvert and "a.k.a. Signature Pharmacy."[16] (Doc. 180-1). A week later, however, the New York grand jury returned a superseding indictment.[17] (Doc. 168-6); (Doc. 244 at 3). On February 14, 2007, the New York State Court issued arrest warrants for the Loomises and Calvert on the grand jury's first – but not the superseding – indictment. (Doc. 129-2).[18]

---

[16]The inclusion of "a.k.a. Signature Pharmacy," which the New York State Court considered a formal defendant, was dropped in the fourth indictment. *Calvert*, No. 2-1311. slip op. at 4-5. Notwithstanding the inclusion of "a.k.a. Signature Pharmacy," Signature Pharmacy, Inc. was never indicted. (Doc. 180 at 311).

[17]According to Baynes, the superseding indictment simply corrected a typographical error. (Doc. 180 at 309). Plaintiffs dispute that characterization. The first indictment, *inter alia*, failed to include any of the 19 pattern acts on which the enterprise corruption count was predicated. (Doc. 247 at 10); *compare* (Doc. 180-1) *with* (Doc. 168-6). Although the New York State Court observed that the "second indictment did not differ materially from the first indictment," it also found – as Plaintiffs note – that the second indictment "dropped one count of Criminal Possession of a Controlled Substance in the Fifth Degree, added one count of Criminal Diversion of Prescriptions in the Second Degree and changed the Insurance Fraud count from the second to the third degree." *Calvert*, No. 2-1311, slip op. at 3; (Doc. 247 at 10-11). These changes can hardly be characterized as correcting "essentially a very large typo." (Doc. 180 at 309).

[18]It is unclear whether the New York State Court was aware of the superseding indictment at the time it issued the arrest warrants on the superseded indictment and whether the warrants were even valid under New York law. The parties failed to address this issue. For its part, the Court has been unable to find any New York decision addressing the effect (if any) of a superseding indictment on the validity of an arrest warrant issued by a superior court pursuant to N.Y. CPL § 210.10 on a prior, superseded indictment. For purposes of this Order, the Court has simply assumed – without deciding and taking all reasonable inferences in the light most favorable to Plaintiffs – that the New York arrest warrants were invalid as a matter of law.

At approximately 8:00 p.m. on February 26, 2007, Wright – acting without the assistance or presence of counsel – appeared alone at the home of Judge Kest and applied for three search warrants.[19] (Doc. 247 at 11-12). The applications were based, in significant part, on Wright's prior wiretap application. Each application was supported by a probable cause affidavit that was more than 200 pages long; all totaled, the documents before Judge Kest consisted of more than 600 pages. (Tr. at 147); (Doc. 221-3).[20] Approximately one hour later, Wright emerged with signed copies of all three warrants. (Doc. 247 at 12). According to Plaintiffs, Wright's affidavit "carried over many of the falsities, omissions, and misstatements" that were included in the wiretap application, (Doc. 247 at 12), and failed to established probable cause that evidence of a

_____

[19]There is no satisfactory explanation as to why Wright waited until the last minute to apply for these warrants. At this point, the investigation of Signature had been ongoing for several years and there was no exigent reason to act hastily.

[20]All three of the probable cause affidavits were either lost or destroyed – despite an explicit seal order by the Florida State Court – by a court clerk. The only extant "copies" of the affidavits, which were not timely produced to Plaintiffs during discovery, were reconstructed by Wright for the purposes of this litigation. During the evidentiary hearing, Wright testified that he used the same affidavit in support of all three warrants and that he maintained an unaltered Microsoft Word document containing an exact copy of the body of the affidavit in an electronically-stored format. (Tr. 124-129). When the applications were originally signed and approved by Judge Kest, however, Wright made a photocopy of the signature pages (but not the bodies of the affidavits). (Tr. at 130). Accordingly, the document that appears at Doc. 221-3 consists of the body of the affidavit from Wright's Word file with the photocopy of the signed signature pages substituted and attached thereto.

Evidence that is inadmissable at trial cannot be used on summary judgment, *see*, *e.g.*, *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1249 (11th Cir. 2007), and Wright must "produce evidence sufficient to support a finding" that Doc. 221-3 "is what its proponent claims." FED. R. EVID. 901(a).

Upon careful review, and after a lengthy and detailed evidentiary hearing, the Court finds Wright's testimony to be credible and is satisfied that Doc. 221-3 is admissible as a true and correct copy of the probable cause affidavit that was presented to and signed by Judge Kest on February 26, 2007. *See*, *e.g.*, FED. R. EVID. 1004 (an "original is not required, and other evidence of the contents of a writing . . . is admissible" if the original has been lost or destroyed) and 1005 ("If a copy [of a public record] . . . cannot be obtained by the exercise of reasonable diligence, then other evidence of the contents may be given").

crime would be found at Signature's premises. (Doc. 250). The search warrants authorized the

seizure of the following:

> Documents of dominion and control, prescriptions, orders to and from manufacturers, supply lists, theft and loss reports, list and/or inventory of all drugs surrendered to any federal agency, inventory of all drugs on site, Federal Express labels and shipping records, ledgers, packaging, bank statements, documents of vehicle ownership, statements or invoices, address books with contact information, telephone contact lists, cellular telephones and stored information, memory cards, micro chips, data cables and vendor software to facilitate transfer of images, audio equipment, video or surveillance equipment, fax machines, blackberries [sic], telephone numbers, passwords, laptop computers, desk-top [sic] computers.

> Checking records, whether original, copied, recorded or electronically stored, documenting the receipt and disbursement of monies paid to or received from customers and/or clients, and records documenting how such monies were disbursed or invested, including, but not limited to, bank records, cancelled checks (front and back), monthly or periodic statements, deposit slips and detail documents for those deposits, memoranda of incoming and outgoing wire transfers, debit and/or credit memoranda, cashier's check records, current transaction reports, and any correspondence involving each account with a bank or financial institution whether original, copied, recorded or electronically stored.

> Telephone bills and toll records, appointment journals, Rolodex, desk calendars, phone messages or logs, and telephone answering machine tapes; tax returns, bank records, escrow agreements, escrow agent communications, operating agreements, leases, invoices, copied [sic], recorded or electronically stored.

> Computer hardware. . . . [I]nternal and peripheral storage devices such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, and other electronic media devices; peripheral input/output devices such as keyboards, printers, scanners, plotters, video display monitors, and optical readers; and related communications devices such as modems, network adapters, hubs, routers, switches, cables and connections, and recording equipment, as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware such as physical keys, locks or dongles, "electronic address books", [sic] portable data assistants, laptop computer systems, desktop computer systems, calculators, or any other storage media where data can be stored. . . . Computer software required to run the above hardware and/or access data from the hardware. . . . Data maintained on the computer, or computer related storage devices. . . . In particular, data in the form of images, word [sic] documents and spread sheets [sic] and supporting documentation of illegal transactions, and/or log files recording the transmission of said documents; Documents, notes or equipment relating to passwords, encryption codes and data security devices. . . .

(Doc. 127-5 at 2-3). The Court addresses the validity and scope of the search warrants in detail, *infra*.

On the morning of February 27, 2007, Wright, Baynes, Soares, agents from the DEA, and Orlando police officers executed the search warrants at Signature's Orlando and Winter Park locations.[21] They arrived at the premises with large U-Haul trucks and proceeded to seize virtually everything within Signature's stores, including, *inter alia*:

- Attorney client information/documents

- Computers, hard drives, DVRs and power supplies

- More 200,000 patient prescriptions that Signature had filled since 2002

- General business records, tax returns, corporate notebooks, financial records, ledgers, bank transactions, licenses, permits and expense reports

- Current accounts payable, drug invoices, credit card invoices, check payments, and wire transfer requests

- Billing statements, rebate forms and shipping invoices/records

- Insurance reimbursement statements, Medicare information and other health insurance information

- Customer phone lists

- Patient compliance information

- Correspondence, planners, Rolodexes

- Blank prescription and bottle labels

- Inventory lists

- Vendor files

- Trade show/press kits

---

[21]The third search warrant, which is not material to this Order, was executed at a separate location that housed some of Signature's computer servers.

- Investment documents

- Doctor contact, marketing, and conference information

- Compounding formulas

- Shredded documents

- Pharmaceuticals (including Crestor, Stanozol, Nandrolone Decanoate, Testosterone, Testosterone Cypionate, Testosterone Enanthanate, Sustanon Testosterone, Depo-Testosterone, Somatropin, Steno-testosterone, Testosterone Propionate, Human Chorionic Gonadotropin, Phentermine hydrochlorine, Oxandrolone, Oxymetholone, Ketamine, Sildenafil, and Androlone).

(Docs. 174-16 and 174-17); (Doc. 247 at 13). The DEA also copied all of Signature's electronically-stored data. According to Naomi Loomis, Signature's President:

> [O]fficers confiscated virtually every document we would need to run our business. They seized thousands of blank prescription labels that were yet to be used to label prescriptions. They seized an actual file cabinet instead of removing the documents inside it. They seized documents containing communications from various law firms that had represented us over the years. They removed the tape from the security camera that would have recorded the events on the day of the raid. They seized business papers which could not have any possible evidentiary value for the investigation, such as receipts for office items that the company purchased that were kept for accounting or tax purposes. . . .
>
> They seized prescription drugs not identified as part of their investigation [such as Crestor – a cholesterol medication], holding them beyond their expiration date and therefore making them useless for resale.

(Doc. 198, ¶¶ 16-17). In short, the "documents, prescriptions drugs, and other tangible items with no possible evidentiary value . . . which were seized by Orlando, through Wright, effectively placed Signature in a position of being unable to operate its business." (Doc. 247 at 13).

On the day of the raids, the Loomises[22] and Calvert were arrested by OPD officers at the

direction of Wright.[23]  (Doc. 247 at 13-14).  The sole basis for the arrests was the New York arrest

warrants.  (Tr. at 8-9).[24]  Despite repeated requests from their counsel, who were called to the

scene during the raids, the Loomises and Calvert were not provided with a copy of the New York

warrants.  (Doc. 247 at 14); (Doc. 195).  Indeed, neither Soares nor Baynes brought copies of the

warrants with them to Florida and no one at OPD, MBI or the DEA ever received a copy of the

warrants prior to the arrests.  Although at least two officers were apparently told that OPD had

received a National Crime Information Center ("NCIC") teletype hit on the New York warrants,

(Doc. 129-9 at 3-4), there is no record of the New York warrants ever having been entered into

---

[22]The Loomises were not at the store on the day of the raids and, notwithstanding their offers
to voluntarily surrender (which were conveyed by counsel), were directed to come to the store on Kuhl
Avenue so that they could be arrested in the presence of the media.  (Doc. 198).

[23]There is a dispute as to the extent of Wright's role in the arrests.  Although Wright was not
formally listed as the arresting officer for the arrests, (Doc. 129-9), he concedes that he "arguably
seized two of the Plaintiffs, Kirk Calvert and Stan Loomis," (Doc. 221 at 8), and, more specifically,
that he placed handcuffs on Stan Loomis (Doc. 246 at 10).  As the lead agent in charge of the
investigation and the execution of the search warrants, however, the only reasonable inference that can
be drawn from the record at this stage of the proceedings is that Wright directed and orchestrated the
arrests.

[24]According to the arrest affidavits prepared by OPD, the Loomises and Calvert were arrested
without any Florida warrant pursuant to FLA. STAT. § 941.14, a provision of Florida's Uniform
Interstate Extradition statute. (Doc. 129-9 at 1-4), which provides:

> The arrest of a person may be lawfully made also by any peace officer or a private
> person, without a [Florida] warrant upon reasonable information that the accused
> stands charged in the courts of a state with a crime punishable by death or
> imprisonment for a term exceeding 1 year, but when so arrested the accused must be
> taken before a judge with all practicable speed and complaint must be made against the
> accused under oath setting forth the ground for the arrest as in the preceding section;
> and thereafter his or her answer shall be heard as if the accused had been arrested on
> a warrant.

FLA. STAT. § 941.14.  In contravention of the statute, the Loomises and Calvert do not appear to have
been "taken before a judge with all practicable speed" and no complaint setting forth the basis for the
arrests ever appears to have been made.

NCIC or that a dispatcher at OPD ever requested – much less received – a teletype hit on the New York warrants prior to the arrests. Soares and Baynes simply informed Wright that valid New York warrants existed. (Doc. 127-3 at 55); (Tr. at 11).[25] It was not until at least a day after the Loomises and Calvert were arrested, and after they were processed at the Orange County Jail, that any law enforcement agency in Florida ever received a copy of the New York warrants (and only then, by facsimile). (Tr. at 11-12).

The media presence during the raids and arrests was intense.[26] (Doc. 247 at 14). Before law enforcement even arrived at Signature's stores, Lyons – who was soon joined by others from the media – was already at the scene. By the afternoon, there were local and national media outlets present with reporters, cameramen, and satellite trucks. (Doc. 195 at 2, ¶4). The Loomises and Calvert were handcuffed and made to exit the premises amidst a throng of reporters before being escorted to a patrol car. (Doc. 247 at 14).

Since February 27, 2007, Signature has been unable to conduct any business, its reputation having been severely damaged and its inventory, business records and other items essential to its operations never having been returned by law enforcement. (Doc. 247 at 20). Calvert and Mike Loomis have remain unemployed. (Doc. 247 at 20). To this day, however, the Loomises remain licensed pharmacists and not a single administrative action was ever taken against them.

---

[25]Baynes and Soares, however, swear that they did not provide direction or advice to law enforcement as to how agents should engage or proceed with the arrests. (Doc. 244 at 5).

[26]News and footage of the arrests were provided on a national basis. *See*, *e.g.*, Nicholas Confessore et al., *Arrests Reflect a New Focus on Fighting Steroid Sales*, N.Y. TIMES, March 1, 2007, *available at* http://www.nytimes.com/2007/03/01/nyregion/01steroids.html; *NY investigation leads to raid of Orlando pharmacy*, ESPN, March 1, 2007, *available at* http://sports.espn.go.com/espn/ news/story?id=2781674; Brendan J. Lyons, *A web of easy steroids*, ALB. TIMES-UNION, Feb. 28, 2007, *available with video footage at* http://www.timesunion.com/AspStories/story.asp?storyID= 567310&category=REGIONOTHER&BCCode=HOME&newsdate=2/28/2007.

## III.  Applicable Law

### A.  Summary Judgment

A party is entitled to summary judgment when it can show that there is no genuine issue as to any material fact.  FED. R. CIV. P. 56(c); *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994).  Which facts are material depends on the substantive law applicable to the case.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  The moving party bears the burden of showing that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Servs., Inc.*, 252 F. Supp. 2d 1347, 1351-52 (M.D. Fla. 2003).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324-25 (internal quotations and citations omitted). Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish a genuine issue of fact for trial.  *Id*. at 322, 324-25; *Watson*, 252 F. Supp. 2d at 1352.  The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts.  *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value") (citations omitted); *Broadway v. City of Montgomery, Ala.*, 530 F.2d 657, 660 (5th Cir. 1976).

In determining whether the moving party has satisfied its burden, the Court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the

motion, and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255. The Court is not, however, required to accept all of the nonmovant's factual characterizations and legal arguments. *Beal*, 20 F.3d at 458-59.

**B. 42 U.S.C. § 1983**

Actions to remedy a violation of the U.S. Constitution by a state actor are enabled through 42 U.S.C. § 1983. To sustain a § 1983 claim, a plaintiff must establish that: (1) he suffered a deprivation of rights, privileges or immunities secured by the Constitution or laws of the United States; and (2) the act or omission causing the deprivation was committed by a person acting under color of law.[27] *See, e.g.*, *Wideman v. Shallowford Community Hosp. Inc.*, 826 F.2d 1030, 1032 (11th Cir. 1987). "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 (1979)). Therefore, the first step in analyzing a § 1983 claim is to identify the specific constitutional right allegedly violated by the defendant. *Id*. Once the constitutional right is identified, the court must then apply the standard applicable to that particular provision to determine whether a constitutional violation actually occurred. *Graham v. Connor*, 490 U.S. 386, 394 (1989).

**C. Qualified Immunity**

*Claims Relating to Search Warrants*

Qualified immunity protects all but the plainly incompetent officer, or an officer who knowingly violates the law, in obtaining a search or arrest warrant. *See Malley v. Briggs*, 475 U.S. 335, 341 (1986) (rejecting the application of *Harlow v. Fitzgerald*, 457 U.S. 800 (1982) in the warrant context). In *United States v. Leon*, the Supreme Court recognized that "[r]easonable

---

[27]It is undisputed that Wright was acting under color of law.

minds frequently may differ on the question whether a particular affidavit establishes probable cause. . . ." 468 U.S. 897, 914 (1984). Accordingly, the standard of objective reasonableness applied in the context of a criminal suppression hearing – as discussed in *Leon* – defines the qualified immunity accorded to an officer whose affidavit in support of a warrant leads to an unconstitutional search. *Malley*, 475 U.S. at 344.

Qualified immunity also protects officers in the execution of search warrants. If an officer executes a search warrant that fails to comply with the particularity requirement of the Fourth Amendment, he is entitled to immunity unless the plaintiff can show that "no reasonable officer could believe that [the] warrant plainly did not comply with" the particularity requirement. *Groh v. Ramirez*, 540 U.S. 551, 563 (2004). If the officer prepared the invalid warrant, however, "he may not argue that he reasonably relied on the Magistrate's assurance that the warrant contained an adequate description of the things to be seized and was therefore valid." *Id.* at 564.

### All Other § 1983 Claims

The doctrine of qualified immunity protects government and law enforcement officials from civil liability in the performance of "discretionary functions . . . insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818. Assuming the official can establish that he was acting within the scope of his discretionary authority,[28] the burden then shifts to the plaintiff to show that the grant of qualified immunity is inappropriate. Under *Saucier v. Katz*, 533 U.S. 194 (2001), and *Pearson v. Callahan*, 555 U.S. - - -, 129 S. Ct. 808 (2009), an official is entitled to qualified immunity unless the plaintiff can demonstrate that: (1) the facts viewed in the light most favorable to the plaintiff establish a constitutional violation; and (2) the right at issue was "clearly

---

[28]It is undisputed that Wright was acting within the scope of his discretionary authority.

established" at the time of the official's alleged misconduct.[29]  *Pearson*, 129 S. Ct. at 815-16

(citing *Saucier*, 533 U.S. at 201); *see also*, *e.g.*, *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir.

2009).  This inquiry "must be undertaken in light of the specific context of the case, not as a broad

general proposition."  *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).

## IV.  Discussion

### A.  Unlawful Seizure Claims

In their Unlawful Seizure claims, Plaintiffs assert that Wright violated their Fourth

Amendment rights in two ways: (1) by applying for search warrants that were not issued upon

probable cause; and (2) by seizing property that exceeded the scope of any valid warrant.  (Doc. 3,

¶ 119).  Wright contends that Plaintiffs lack standing and that he is entitled to qualified immunity.

(Doc. 129 at 2).

As a threshold matter, Wright's standing argument warrants little discussion.  It is beyond

peradventure that the Fourth Amendment's protections extend not only to privacy interests, but to

interests in property.  *See*, *e.g.*, *Horton v. California*, 496 U.S. 128, 133 (1990) ("The right to

security in person and property protected by the Fourth Amendment may be invaded in quite

different ways by searches and seizures.  A search compromises the individual interest in privacy;

a seizure deprives the individual of dominion over his or her person or property"); *Katz v. U.S.*,

389 U.S. 347, 350 (1967) (noting that while Fourth Amendment protects individual privacy

interests, "its protections go further, and often have nothing to do with privacy at all.").  That a

pharmacy such as Signature may be subject to routine or even unannounced inspection by various

regulatory bodies is of no moment.  In the main, Plaintiffs are not complaining of an illegal

---

[29]Courts now have discretion to decide which prong of the inquiry to address first.  *Pearson*, 129 S. Ct. at 818; *Rehberg v. Paulk*, 598 F.3d 1268, 1277 (11th Cir. 2010).

invasion of their privacy, but the unlawful seizure of their property. It is therefore clear that Plaintiffs have standing to assert their Unlawful Seizure claims.

### 1. Probable Cause for the Warrants

The Fourth Amendment provides, in pertinent part, that "no Warrants shall issue, but upon probable cause. . . ." U.S. CONST. amend. IV. When a search or seizure is authorized by a warrant, courts must give "great deference" to the issuing magistrate's determination of probable cause. *Leon*, 468 U.S. at 914 (citations and internal quotations omitted). This deference, however, is not boundless and does not preclude inquiry into the affidavit upon which the magistrate's finding of probable cause was based. *Id*. If the affidavit is the only matter presented to the issuing magistrate, the probable cause necessary for the validity of the warrant must stand or fall solely on the contents of the affidavit. *Aguilar v. Texas*, 378 U.S. 108, 109 n.1 (1964); *Giordenello v. U.S.*, 357 U.S. 480, 487 (1958). To establish probable cause, an affidavit must provide the magistrate with a substantial basis for believing that, in the totality of the circumstances, a search will uncover evidence of a crime in the place to be searched. *Ornelas v. U.S.*, 517 U.S. 690, 696 (1996); *Leon*, 468 U.S. at 915 ("reviewing courts will not defer to a warrant based on an affidavit that does not provide the magistrate with a substantial basis for determining the existence of probable cause") (quotations and citations omitted); *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *see also Franks v. Delaware*, 438 U.S. 154, 164 (1978).

In a § 1983 action, a plaintiff must show that the officer knowingly or recklessly made false statements in his affidavit that were necessary to the finding of probable cause required for the issuance of the warrant. *See*, *e.g.*, *Holmes v. Kucynda*, 321 F.3d 1069, 1083 (11th Cir. 2003);

*Dahl v. Holley*, 312 F.3d 1228, 1235 (11th Cir. 2002); *Jones v. Cannon*, 174 F.3d 1271, 1285 n.8 (11th Cir. 1999); *Kelly v. Curtis*, 21 F.3d 1544, 1554 (11th Cir. 1994).[30]

In analyzing the issue of probable cause, the first factor to be considered is the crime which the suspects are allegedly committing. Once this is established, the analysis turns to the facts that purport to satisfy the elements of that crime.

Notwithstanding lengthy statutory (and inapposite regulatory) string citations, Wright's affidavit never explicitly identifies the statute(s) (much less the elements of any crime) that Plaintiffs allegedly violated. Distilled to its essence, however, the affidavit charges Plaintiffs with violating FLA. STAT. § 893.13, the Florida statute which makes it unlawful for any person to sell, manufacture or deliver a controlled substance.[31] Of course, these substances may be legitimately prescribed for medical uses, so the statute creates an express exemption for, *inter alia*, doctors/practitioners and pharmacists. *See* FLA. STAT. § 813.13(9).[32] Moreover, FLA. STAT. § 893.04 specifically authorizes a pharmacist to dispense controlled substances upon the prescription of a practitioner, so long as it is done in good faith and in the course of the pharmacist's

---

[30]Although *Holmes*, *Jones* and *Curtis* involved arrest warrants, the Supreme Court and the Eleventh Circuit have made clear that the same standard applies to search warrants. *See*, *e.g.*, *Malley*, 475 U.S. at 344 n. 6 ("Although the case before us concerns a damages action for an officer's part in obtaining an allegedly unconstitutional arrest warrant, the distinction between a search warrant and an arrest warrant would not make a difference. . . ."); *Dahl*, 312 F.3d at 1235 (11th Cir. 2002); *Kelly*, 21 F.3d at 1554.

[31]In Florida, anabolic steroids and human growth hormone are, with some exceptions, classified as Schedule III controlled substances. FLA. STAT. § 893.03. "A substance in Schedule III has a potential for abuse less than the substances contained in Schedules I and II and has a currently accepted medical use in treatment in the United States, and abuse of the substance may lead to moderate or low physical dependence or high psychological dependence, or, in the case of anabolic steroids, may lead to physical damage." *Id*.

[32]Wright conveniently omits any reference to this section of the statute.

professional practice.[33]  There is no contention in the affidavit that Signature violated this statute. Instead, Wright's affidavit apparently focuses on FLA. STAT. § 893.13(8)(a), which prohibits a *practitioner* from prescribing a controlled substance under circumstances that amount to fraud or deceit.[34]  Presumably, this is the "bad faith" sale that Wright references in his affidavit.  He also refers to FLA. STAT. §§ 777.011 and 777.04(3), which generally make it a crime to aid and abet or conspire with another to commit a violation of Florida law.  Thus, the factual underpinning of the affidavit must deal with the manner and means by which Signature's principals *knowingly* assisted practitioners who were writing prescriptions in violation of FLA. STAT. § 893.03(8).[35]

This Court has laboriously examined each and every page of Wright's 212-page affidavit. When the alleged falsities identified by Plaintiffs in their sur-replies (which are, in at least some instances, amply supported by favorable inferences in the record), and the evidence obtained from the wiretap (which the Court has simply assumed was issued without probable cause) are omitted from the affidavit, there is scant basis to conclude that Signature's principals knowingly assisted or otherwise conspired with practitioners to violate FLA. STAT. § 893.13(8)(a).

---

[33]Wright also omits any reference to this statute.

[34]While Wright does at least reference FLA. STAT. § 893.13(8)(a), he omits any reference to an applicable safe harbor in subsection (8)(b), which provides: "If the prescribing practitioner wrote a prescription or multiple prescriptions for a controlled substance for the patient . . . for which there was no medical necessity, or which was in excess of what was medically necessary to treat the patient . . . that fact does *not* give rise to *any* presumption that the prescribing practitioner violated subparagraph (a)1., but may be considered with other competent evidence in determining [whether a violation occurred]."  FLA. STAT. § 893.13(8)(b) (emphasis added).

[35]Wright also lists a provision of Florida's racketeering statute as another source of criminal liability.  No incidents of racketeering, however, are explicitly identified in the affidavit.  Nor is there any allegation, *inter alia,* that anyone knowingly and willfully became a member of any conspiracy with the specific intent to commit two incidents of racketeering or participate in the affairs of the enterprise with the knowledge and intent that other members of the conspiracy would engage in at least two incidents of racketeering.

Even assuming, however, that the search warrant was issued without probable cause, the Court's inquiry does not end there. Under *Malley* and its progeny, the lack of probable cause for an otherwise valid warrant will rarely render an officer's reliance unreasonable. 475 U.S. at 344-45. This is especially true where, as here, there is a significant presumption that attaches to the Florida State Court's determination of probable cause. In short, whatever deficiencies may have existed in the affidavit, this Court simply cannot conclude that the warrant application was "so lacking in indicia of probable cause as to render official belief in its existence unreasonable," *Id.*, or that a reasonable officer would have known that Wright's testimony was "not just negligently false, but recklessly so." *Holmes*, 321 F.3d at 1083 (citations and quotations omitted).

Accordingly, Wright's Motion will be granted, on qualified immunity grounds, as to Plaintiffs' claims that he applied for search warrants that were not issued upon probable cause.

## 2. The Validity of the Warrants and Scope of the Seizure

In addition to the requirement that a warrant be issued upon probable cause, the Fourth Amendment requires that a warrant "particularly describe[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV; *see also*, *e.g.*, *U.S. v. Khanani*, 502 F.3d 1281, 1289 (11th Cir. 2007) ("The Fourth Amendment . . . mandates that search warrants particularly describe the place to be searched, and the persons or things to be seized"). It is well established that "a search conducted pursuant to a warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional." *Groh*, 540 U.S. at 564 (quoting *Massachusetts v. Sheppard*, 468 U.S. 981, 988 (1984)). Furthermore, it "is incumbent on the officer executing a search warrant to ensure the search is lawfully authorized and lawfully conducted." *Id.* at 563. This is "not a duty to proofread; it is, rather, a duty to ensure that the warrant conforms to constitutional requirements." *Id.* at 563 n.6.

The search warrants at issue in this case plainly failed to pass muster under the Fourth Amendment's particularity requirements. Neither the place to be searched nor especially the items to be seized were described with reasonable particularity.

With respect to place, the warrant for Kuhl Avenue – the location of Signature's compounding pharmacy and the primary focus of Wright's affidavit – simply identifies a street address, notes that the address "is a two story building," and describes the entryways and doors of the building (Doc. 129-6 at 14). There is no mention of the fact that the address refers to a multiple-occupancy structure or that there were doctors' offices unaffiliated with Signature on the second floor of the building. Nor does the warrant disclose that Signature segregated its pharmacy (which was on the first floor) from its corporate offices (which was the second floor). The warrant for Aloma Avenue,[36] while at least disclosing that there are other occupants in the building, contains the same meager address information and only a brief description of the outside of the building. (Doc. 129-5 at 1). Neither warrant describes the particular floor, office, suites or subunits to be searched.[37] In short, nothing in the warrants would preclude an indiscriminate search of the entire buildings. Quite the contrary, the warrants give every suggestion that Wright could – and did – do just that. This is clearly improper. *See*, *e.g.*, *Maryland v. Garrison*, 480 U.S. 79 (1987); *U.S. v. Higgins*, 428 F.2d 232 (7th Cir. 1970); *see also* Wayne R. LaFave, *Search and*

---

[36]There does not appear to be a copy of the warrant for Aloma Avenue in the record – only a copy of the warrant application. (Doc. 129-5). The Court, however, obtained a copy of the warrant from the Osceola County Clerk of the Court and has verified that the warrant application for Aloma Avenue and the warrant contain the same description of the place to be searched and items to be seized. Accordingly, the Court cites to the document at Doc. 129-5.

[37]The warrant for Aloma Avenue actually mentions the offices of "Dr.[] Glenn Johnston" in bold, suggesting that, along with Signature (also identified in bold), agents were permitted to search Dr. Glenn Johnston's office. Although Dr. Johnston is identified in Wright's affidavit as a possible co-conspirator, there is no request in the warrant application or affidavit to search Dr. Johnston's office and nothing in those documents would have alerted the State Court to such a request.

*Seizure: A Treatise on the Fourth Amendment* § 4.5(b) (4th ed. current through 2009) ("A search warrant for . . . [a] multiple-occupancy building will usually be held invalid if it fails to describe the particular subunit to be searched with sufficient definiteness to preclude a search of one or more subunits indiscriminately").

Notwithstanding the failure to reasonably describe the places to be searched, the more troubling defect in the warrants is the failure to describe the items to be seized with particularity. The purpose of a warrant is to uncover evidence of an alleged crime within the premises to be searched. Here, Wright was ostensibly looking for evidence that Signature knowingly facilitated the writing of bad faith prescriptions by doctors in violation of FLA. STAT. § 893.13(8)(a). The warrants and documents putatively incorporated therein make no effort to even suggest that Wright would find evidence of such a crime on Signature's premises – let alone identify the types of items which would provide evidence of that crime. Yet the warrants authorized the search and seizure of virtually everything on site, including, *inter alia*:

> Documents of dominion and control . . .prescriptions . . . supply lists . . . [inventories] . . . shipping records . . . ledgers . . . bank statements . . . documents of vehicle ownership . . . statements or invoices . . . address books . . . cellular phones . . . data cables . . . audio equipment . . . [video equipment] . . . fax machines . . . [B]lackberries . . . laptop [and desktop computers] . . . [all] banking records . . . [t]elephone bills and tolls records . . . telephone answer machine tapes . . . tax returns . . . operating agreements . . . leases . . . invoices . . . [all] computer hardware . . . peripheral input/output devices such as keyboards, printers, scanners, plotters, video display monitors, and optical readers . . . portable data assistants . . . calculators . . . [c]omputer software . . .[c]omputer-related documentation . . . In particular, data in the form of images, word documents and spread sheets and supporting documentation of illegal transactions . . . All computer files associated with the accounts listed above[38] . . . .

> which is evidence of a criminal violation of the laws of the State of Florida, to-wit: [half-page string cite to Florida and federal statutes].

---

[38]No "accounts" were "listed above" in the warrants.

(Docs. 129-5 at 1-3 and 129-6 at 15-16). Nothing in the warrants explained that the items sought were those related to a violation of Fla. Stat. § 893.13(8)(a). A lengthy laundry list of specific items unconnected – in any way – to an alleged crime is no better than a warrant for "all evidence" of an alleged crime. Absent at least *some* nexus between the alleged crime and the items to be seized, an officer can simply "rummage and seize at will." *Minnesota v. Dickerson*, 508 U.S. 366, 378 (1993) (internal citations and quotations omitted). Exploratory searches such as these have been roundly condemned since well before the founding of our nation.[39]

In sum, the search warrants in this case amount to general warrants that failed to comply with the particularity requirements of the Fourth Amendment. On the day of the raids, "[n]othing circumscribed [Wright's] activities . . . except [his] own good senses." *U.S. v. Matlock*, 415 U.S. 164, 185 (1974) (internal citations and quotations omitted). No reasonable officer could possibly have believed that the warrants Wright possessed gave him the authority to simply arrive with U-Haul trucks, enter any office or suite in the buildings shared by Signature, and cart away virtually everything found therein. That is precisely, however, what appears to have occurred in this case.

Notwithstanding the foregoing, the sum total of Wright's argument concerning the seizures consists of the following:

---

[39]"Vivid in the memory of the newly independent Americans were those general warrants known as writs of assistance under which officers of the Crown had so bedeviled the colonists. The hated writs of assistance had given customs officials blanket authority to search where they pleased for goods imported in violation of British tax laws. They were denounced by James Otis as 'the worst instrument of arbitrary power, the most destructive of English liberty, and the fundamental principles of law, that ever was found in an English law book, because they placed the 'the liberty of every man in the hands of every petty officer.' The historic occasion of that denunciation, in 1761 at Boston, has been characterized as 'perhaps the most prominent event which inaugurated the resistance of the colonies to the oppressions of the mother country. 'Then and there,' said [J]ohn Adams, 'then and there was the first scene of the first act of opposition to the arbitrary claims of Great Britain. Then and there the child Independence was born.'" *Stanford v. Texas*, 379 U.S. 476, 481-82 (1965) (internal citations and quotations omitted).

> The search conducted in this case was made pursuant to a lawfully issued search warrant supported by probable cause. . . . Furthermore, Agent Wright did not exceed the scope of the search warrant. All items seized were encompassed within the scope of the search warrant, evidence of criminal activity or properly seized pursuant to Florida's Contraband Act.[40] After the seizure of evidence took place, a judicial determination was timely made that probable cause support [sic] seizure of all items.

(Docs. 129 at 21 and 221 at 9). Wright fails to provide a single example of an item of evidence that amounted to evidence of criminal activity. Furthermore, his contention that a "judicial determination" was made regarding the probable cause to support the seizures is completely without support in the record.[41]

Upon review, Wright's Motion will be denied as to Plaintiffs' claims that Wright illegally prepared and executed the search warrants. The warrants were invalid on their face and Plaintiffs have carried their burden of showing that the grant of qualified immunity is inappropriate.

## B. Unlawful Arrest Claims

Plaintiffs had a clearly established right not to be arrested without probable cause. *See*, *e.g.*, *Madiwale v. Savaiko*, 117 F.3d 1321, 1324 (11th Cir. 1997). Probable cause exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that a suspect has committed or was committing a crime. *U.S. v. Gonzalez*, 969 F.2d 999, 1002 (11th Cir. 1992) (citations omitted). In determining whether qualified immunity

---

[40]There is no discussion of Florida's Contraband Act (or even an identification of that statute) in Wright's Motion. Furthermore, the warrants themselves were specifically for "evidence" – not contraband. Finally, Wright makes no suggestion that any contraband was seized in plain view.

[41]Wright's Motion failed to identify a single order or decision (whether written, *ore tenus*, or otherwise) by the Florida State Court that could remotely be characterized as a "judicial determination" regarding the probable cause to support the seizures. Nor has this Court found such a determination and it has been presented with a rather detailed record of the proceedings in the Florida State Court. *See In re: Grand Jury No. 09-1*, Case No. 6:10-mc-38 (M.D. Fla. 2010). Even if Wright had identified such a determination, he provides no analysis whatsoever as to why that determination would save an otherwise invalid warrant or, in any event, be binding on this Court.

exists on a claim for false arrest, however, the issue is not probable cause in fact, but "arguable" probable cause. *Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir. 1990) (citations omitted); *see also Kingsland v. City of Miami*, 382 F.3d 1220, 1232 (11th Cir. 2004). "Arguable probable cause exists where reasonable officers in the same circumstances and possessing the same knowledge as the Defendant could have believed that probable cause existed to arrest." *Case v. Eslinger*, 555 F.3d 1317, 1327 (11th Cir. 2009) (quotations and citations omitted).

Here, Plaintiffs were arrested pursuant to FLA. STAT. § 941.14 on the basis of supposed New York arrest warrants. Although Wright did not have a copy of the New York warrants, Soares and Baynes – the New York prosecutors responsible for securing the arrest warrants – represented to Wright that there were active, valid warrants for Plaintiffs' arrest. (Tr. at 11). As noted, *supra*, FLA. STAT. § 941.14 simply requires that an officer have "reasonable information" that an individual stands charged with a felony in another state before he can make a warrantless arrest. The representations from Soares and Baynes, as inaccurate as they were, constitute reasonable information upon which Wright could have relied in arresting Plaintiffs. *See Whren v. U.S.*, 517 U.S. 806 (1996) (recognizing that the touchstone for Fourth Amendment inquiries is "reasonableness").

Upon review, Wright's Motion will be granted, on qualified immunity grounds, as to Plaintiffs' Unlawful Arrest claim. Although the Loomises' and Calvert's constitutional right not to be arrested without probable appears to have been violated inasmuch as no valid, outstanding New York warrants existed at the time of their arrests, the Court finds that, under the totality of the circumstances, Wright had "arguable probable cause" to arrest Plaintiffs and is therefore entitled to qualified immunity on Plaintiffs' Unlawful Arrest claim.

### C. Malicious Prosecution Claim

To prevail on their malicious prosecution claims under § 1983, Plaintiffs must establish the elements of the common law tort of malicious prosecution under Florida law and a violation of their rights under the U.S. Constitution. *See, e.g.*, *Kingsland v. City of Miami*, 382 F.3d 1220, 1234 (11th Cir. 2004). To establish the common law tort of malicious prosecution under Florida law, Plaintiffs must show: (1) an original judicial proceeding was commenced or continued against them; (2) Wright was the legal cause of the proceeding; (3) the termination of the proceeding constituted a bona fide termination of that proceeding in Plaintiffs' favor; (4) there was an absence of probable cause for the proceeding; (5) there was malice on the part of Wright; and (6) damages. *Id*. (citing *Durkin v. Davis*, 814 So. 2d 1246, 1248 (Fla. 2d DCA 2002); *see also Alamo Rent-A-Car, Inc. v. Mancusi*, 632 So. 2d 1352, 1355 (Fla. 1994).

Upon review, Wright's Motion will be granted as to Plaintiffs' Malicious Prosecution claim. In short, Plaintiffs have failed to adduce sufficient evidence on the second and fifth elements of their claim.[42] There is simply no evidence that Wright was the legal cause of the proceedings in New York (Soares and Baynes, and perhaps Haskins, were the cause of those proceedings). Similarly, notwithstanding his arrest of Plaintiffs and the execution of invalid search warrants, there is nothing in the record evincing malice on Wright's part. Accordingly, Wright is entitled to a judgment as a matter of law on Plaintiffs' Malicious Prosecution claim.

---

[42]Furthermore, for the time being, at least, there has not been a termination of the New York proceedings. *Loomis*, 896 N.Y.S.2d at 211.

**D. Defamation Claim**

To prevail on their defamation claim, Plaintiffs must establish the elements of the common law tort of defamation under Florida law, plus an additional constitutional injury flowing from the defamation that is tied to a recognized property or liberty interest. *Rehberg*, 598 F.3d at 1286-87; *Cannon v. City of W. Palm Beach*, 250 F.3d 1299,1302 (11th Cir. 2001); *see also Paul v. Davis*, 424 U.S. 693 (1976). Defamation of a private person has five elements under Florida law: (1) publication to a third party; (2) a false statement; (3) fault, amounting to at least negligence, in the making of the publication; (4) actual damages; and (5) a defamatory statement. *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008); *see also*, *e.g.*, *Thomas v. Jacksonville Television, Inc.*, 699 So. 2d 800, 803 (Fla. 1st DCA 1997) (citations and quotations omitted).

Upon review, Plaintiffs have failed to adduce sufficient evidence on the first element of their Defamation Claim. Although Wright may have conspired with Soares, Baynes and Haskins to defame Plaintiffs, there is simply no record evidence that Wright published any statement to the media or any other third party. Accordingly, to the extent Plaintiffs assert that Wright should be liable for his own defamatory acts, Wright is entitled to a judgment as a matter of law on Plaintiffs' Defamation claim.

**E. Unlawful Conspiracy Claims**

In his Motion, Wright contends that Plaintiffs failed to allege sufficient facts in support of an unlawful conspiracy claim under 42 U.S.C. § 1985. (Doc. 129 at 24). However, as Plaintiffs pointed out in their Response, and as the Court noted, *supra*, Plaintiffs have not asserted a conspiracy claim pursuant to § 1985 – their Conspiracy Claim is predicated solely on § 1983. Rather than address that claim, however, Wright stated in his Reply: "Defendants in this case are entitled to fair notice concerning the claims asserted against them. It would be unjust to allow

Plaintiffs to seek recovery on a conspiracy claim brought pursuant to § 1983 when the claim as stated in the Amended Complaint *only references* 42 U.S.C. § 1985." (Doc. 221 at 10) (emphasis added). That statement is, at best, disingenuous, and Wright's failure to provide any meaningful analysis of Plaintiffs' Unlawful Conspiracy claim warrants denial of his Motion.

The Amended Complaint clearly asserts:

**COUNT VI – 42 U.S.C. §§ *1983* AND 1985
(INDIVIDUAL DEFENDANTS)**

129. This is a cause of action by Plaintiffs against all of the Individual Defendants only for violation of civil rights under *42 U.S.C. § 1983*. . . .

(Doc. 3 at 30) (emphasis added).

Despite the foregoing, Wright's only argument in favor of summary judgment, which is buried in the final paragraph of his Reply, is that: "There exists no set of facts that would support a finding that the Defendants [sic] conspired to violate the Plaintiffs' constitutional rights. None of the facts alleged in support of Plaintiff's [sic] claim constitute a violation of a federally protected right." (Doc. 221 at 10).

Upon review, Wright's Motion will be denied as to Plaintiffs' Unlawful Conspiracy Claim. Notwithstanding this Court's already exhaustive analysis, it is not the responsibility of the courts to sift through the entire record and make the parties' arguments for them. *See, e.g.*, *U.S. v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."); *U.S. v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace.") (internal quotation omitted).

## V. Conclusion

For the foregoing reasons, it is **ORDERED** and **ADJUDGED** that:

1. Defendant Alex Wright's Motion for Summary Judgment (Doc. 129) is **GRANTED** in part and **DENIED** in part;

2. Defendant Alex Wright is entitled to qualified immunity as to Plaintiffs' claims that he applied for search warrants that were not issued upon probable cause, and as to Plaintiffs' Unlawful Arrest claims, in Count V of the Amended Complaint;

3. Defendant Alex Wright is entitled to a judgment as a matter of law on Plaintiffs' Malicious Prosecution and Defamation claims in Count V of the Amended Complaint; and

4. In all others respects, Defendant Wright's Motion for Summary Judgment (Doc. 129) is **DENIED**.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on June 10, 2010.

Copies furnished to:

Counsel of Record
Unrepresented Party

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE