SIGNATURE PHARMACY, INC.,
ROBERT STAN LOOMIS, KENNETH
MICHAEL LOOMIS, NAOMI LOOMIS,
KIRK CALVERT and TONY
PALLADINO,

     **Plaintiffs,**

-vs-          Case No.  6:08-cv-1853-Orl-31GJK

P. DAVID SOARES, CHRISTOPHER B.
BAYNES, ALBANY COUNTY DISTRICT
ATTORNEY'S OFFICE, MARK HASKINS,
CITY OF ORLANDO, FLORIDA and
ALEX WRIGHT,

     **Defendants.**
_____

# ORDER

This matter came before the Court without oral argument upon consideration of

Defendants', P. David Soares, Christopher P. Baynes and the Albany County District Attorney's

Office, Motion for Summary Judgment (the "Motion") (Doc. 161), Plaintiffs' response in

opposition thereto (Doc. 207), and Defendants' reply (Doc. 222).

## I.  Overview

In November 2005, authorities began investigating Signature Pharmacy, Inc. ("Signature")

and its principals[1] for violations of federal and state statutes restricting the sale of prescription

_____

[1]Signature is owned by Robert Stan Loomis ("Stan Loomis"), Naomi Loomis ("Naomi Loomis"), and Kenneth Michael Loomis ("Mike Loomis").  Kirk Calvert ("Calvert") and Tony Palladino ("Palladino") were employees of Signature.  These individuals are referred to collectively herein as the "Individual Plaintiffs" (all plaintiffs, including Signature, are referred to as "Plaintiffs").

Signature operated two pharmacies in Central Florida: a traditional pharmacy located on Aloma Avenue in Winter Park and a compounding pharmacy located on Kuhl Avenue near downtown Orlando.  A compounding pharmacy creates customized medications for patients whose

anabolic steroids and human growth hormone.  The investigation was carried out by multiple

federal and state law enforcement agencies[2] in Florida and New York and included, *inter alia*: a

wiretap of Signature's phones; multiple grand jury proceedings before a New York County Court;

and the seizure of virtually everything on Signature's premises.

On the investigation came to a head on February 27, 2007, when the Albany County, New

York District Attorney, one of his Assistant District Attorneys, and local law enforcement in

Orlando raided Signature's premises, seized its property and arrested its principals.  The raids were

conducted in the presence of the media and highly publicized; certain Plaintiffs were directed to

come to Signature so that they could be "perp walked" and the New York District Attorney held a

press conference in which he connected Signature to professional athletes.  A week later, Plaintiffs

were transported to Albany, New York for arraignment.

Despite the foregoing, Plaintiffs have never been tried for any criminal wrongdoing.  The

State of Florida formally declared that it would not prosecute, four of the New York

indictments were dismissed,[3] and all of the property seized during the raids was ordered to be

returned to Signature.

On September 24, 2008, Plaintiffs brought suit pursuant to 42 U.S.C. § 1983

[hereinafter, "§ 1983"].  (Doc. 3).

_____

health care needs may not be met by manufactured medications (including, for example, patients who
need specialized dosing or are allergic to inert ingredients such as binders or dyes in commercially
available products).  International Academy of Compounding Pharmacists, What is Pharmacy
Compounding?, http://www.iacprx.org/site/PageServer?pagename=What_is_ Compounding.

[2]The various agencies in the investigation included, among others, the U.S. Drug Enforcement
Agency, Orlando Metropolitan Bureau of Investigation, New York Bureau of Narcotics Enforcement,
Florida Department of Law Enforcement, U.S. Food and Drug Administration, and Orlando Police
Department.

[3]A fifth indictment was returned on June 16, 2010, (Doc. 304-1), and certain Plaintiffs were
arraigned shortly thereafter, while Defendants' Motion was pending.

## II. Procedural Posture

Litigation arising out of or related to Signature has proceeded on multiple fronts.[4]  In this § 1983 action, Plaintiffs sued P. David Soares ("Soares") and Christopher B. Baynes ("Baynes"), the District and Assistant District Attorney, respectively, for the Albany County, New York District Attorney's Office (the "Albany D.A.'s Office" or "County"); Mark Haskins ("Haskins"), a peace officer with the New York Bureau of Narcotics Enforcement; the City of Orlando; and Alex Wright ("Wright"), a police officer with the Orlando Police Department ("OPD") assigned to the Metropolitan Bureau of Investigation.  To effectively manage this case, the Court focused first on the Florida Defendants (i.e., Orlando and Wright)[5] and will now address Plaintiffs' claims against Soares, Baynes and the Albany D.A.'s Office.[6]

_____

[4]Signature is (or has been) litigating in three separate civil actions: (1) the instant § 1983 action; (2) a civil State Court matter involving the property seized during the raids and a motion for order to show cause against the Florida Office of Statewide Prosecutor, which is pending before the Ninth Judicial Circuit Court, in and for Orange and Osceola Counties, Florida, *In re Matter of Search Warrant*, Case No. 2007-CA-1237 (Fla. Cir. Ct. 2007); and (3) a miscellaneous federal matter in which this Court quashed a federal grand jury subpoena and ordered the return of all of Signature's property, *In re Grand Jury No. 09-1*, Case No. 6:10-mc-38, 2010 WL 2330273 (M.D. Fla. June 10, 2010).

In addition to the foregoing, between January 2007 and February 2008, four successive indictments against Signature's principals were returned by two grand juries in Albany County, New York.  All four indictments, however, were dismissed and the presentment of the fourth indictment, in particular, was "so improper as to impair the integrity of the grand jury" that the trial court denied the People of New York's motion for leave to re-present their charges to a new grand jury.  *People v. Loomis*, 896 N.Y.S.2d 208, 209 (N.Y. App. Div. 2010) (citations and quotations omitted).  On February 18, 2010, the New York appellate court affirmed and agreed with the trial court's findings, but as "a matter of discretion [and] in the interest of justice," modified the trial court's order "by reversing. . .[the denial of] the People's motion for leave to re-present the charges. . . ." *Id.* at 211.  On June 16, 2010, Plaintiffs were indicted for a fifth time. (Doc. 304-1).

[5]The Court disposed of the claims against the City of Orlando on June 4, 2010, (Doc. 282), and entered its order granting in part and denying in part Defendant Alex Wright's Motion for Summary Judgment on June 10, 2010.  (Doc. 287).

[6]The claims against Defendant Haskins will be addressed by separate order.

The Amended Complaint contains the following claims against Soares, Baynes and the Albany D.A.'s Office:[7]

| Description of Claim | Asserted By | Asserted Against |
|---|---|---|
| § 1983 claim for depriving plaintiffs of their right not to be arrested or detained without probable cause, in violation of the Fourth Amendment (Counts I and II – "Unlawful Arrest") | Individual Plaintiffs (except Palladino) | Soares and Baynes (Doc. 3, ¶¶ 54 and 70) |
| § 1983 claim for decisionmaker's violation of Plaintiffs' Fourth Amendment rights (Count III – "*Monell*" claim) | All Plaintiffs | Albany D.A.'s Office (Doc. 3, ¶ 87) |
| § 1983 claim for conspiring to violate Plaintiffs' rights under the Fourth and Fourteenth Amendments (Count VI – "Unlawful Conspiracy") | All Plaintiffs | Soares and Baynes* (Doc. 3, ¶¶ 129-135) |
| Florida common law claim for injurious falsehood (Count VIII – "Injurious Falsehood") | Signature only | Soares and Albany D.A.'s Office (Doc. 3, ¶¶ 156-168) |
| Florida common law claim for defamation (Count IX – "Defamation") | All Plaintiffs | Soares and Albany D.A.'s Office (Doc. 3, ¶¶ 169-182) |
| Florida common law claim for conspiring to intentionally inflict emotional distress (Count X – "Conspiring to Intentionally Inflict Emotional Distress") | Individual Plaintiffs | Soares, Baynes and Albany D.A.'s Office (Doc. 3, ¶¶ 183-189) |

---

[7]As the Court noted in its prior Order, Plaintiffs' Amended Complaint is not a model pleading. (Doc. 287 at 4, n. 8 and 10). While the Court has done its best to construe the Amended Complaint in the light most favorable to Plaintiffs, certain ambiguities cannot be overlooked. In particular, Plaintiffs assert in Counts I and II that Soares and Baynes deprived them of their Fourth and Fourteenth Amendment rights to be "secure from unlawful searches or unlawful restraint[s]," (Doc. 3, ¶¶ 52 and 68), but then go on to assert – in the same counts – that they have also been prosecuted "without probable cause" and that they were deprived of their "right to a fair trial." (Doc. 3, ¶¶ 56-57 and 72-73). The elements of a claim for malicious prosecution (or a § 1983 claim for defamation in connection therewith, *see Marrero v. City of Hialeah*, 625 F.2d 499 (5th Cir. 1980)), however, are not clearly delineated and the Sixth Amendment to the U.S. Constitution is never referenced. Assuming, however, that Plaintiffs have asserted these claims, there has not, *inter alia*, been a favorable termination of the New York criminal proceedings and the New York State Court has not attempted to impanel a jury. Accordingly, neither claim is ripe. *See, e.g., Kingsland v. City of Miami*, 382 F.3d 1220, 1234-45 (11th Cir. 2004) (noting that § 1983 claim for malicious prosecution requires a "bona fide termination" in the plaintiff's favor); *Powers v. Coe (Powers I)*, 728 F.2d 97 (2d Cir. 1984) (delineating § 1983 for deprivation of Sixth Amendment right to impartial trial and noting, *inter alia*, that a plaintiff must demonstrate that other remedies – e.g., voir dire, challenges for cause, and change of venue – were not available or ineffective); *see also Powers v. Coe (Powers II)*, 769 F.2d 72 (2d Cir. 1985).

*Plaintiffs' § 1983 Unlawful Conspiracy claim has also been asserted against Haskins and Wright. Wright has been denied qualified immunity on that claim. (Doc. 287 at 29-30).

In their Motion, Soares and Baynes contend that they are entitled to absolute or, in the alternative, qualified immunity on all of the foregoing claims.[8] The Albany D.A.'s Office contends that Plaintiffs have failed to establish municipal liability and that Plaintiffs' claims for punitive damages fail as a matter of law.[9] Finally, the New York Defendants contend that Plaintiffs have failed to state claims upon which relief may be granted and that they are otherwise entitled to judgments as a matter of law.

The Court has subject matter jurisdiction pursuant to, *inter alia*, 28 U.S.C. §§ 1331 and 1367.

## II. Background[10]

### A. Defendants

<u>Soares</u>

At all material times, Soares was the duly elected district attorney for Albany County, New York.[11] As of April 2009, Soares had never prosecuted a felony case as lead trial counsel; never

---

[8]Soares and Baynes have been sued in their individual capacity only. (Doc. 3, ¶¶ 3-4). The Albany D.A.'s office is alleged to be "a political subdivision situated in Albany County, New York and is responsible for the policies and conduct of its District Attorney and Assistant District Attorneys." (Doc. 3, ¶ 5). Soares, Baynes and the Albany D.A.'s Office (and, where the meaning is clear, Haskins) are referred to collectively herein as the "New York Defendants." All defendants are referred to as "Defendants."

[9]Plaintiffs conceded in their Response that they are not entitled to punitive damages from the Albany D.A.'s Office. (Doc. 207 at 30). Therefore, Plaintiffs' demand for punitive damages from the Albany D.A.'s Office will be stricken from the Amended Complaint.

[10]Unless otherwise indicated, the material facts are not in dispute. Where there are disputes, however, the Court has construed the facts in the light most favorable to Plaintiffs. *See*, *e.g.*, *Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006).

[11]Soares defeated the Democrat incumbent in the 2004 primary and won the general election on November 2, 2004. He was re-elected in the 2008 general election without any substantial opposition (the Republican party did not field a candidate). At the time of his election, Soares had

sat "second chair" in a felony case; never presented a case to a grand jury; never secured a sealed

indictment; and never participated in the execution of a search warrant outside of Albany County,

New York.  (Doc. 168 at 32-34, 41-44, 107 and 179; Soares Dep. at 35-37, 45-48, 118 and 196).

### Baynes

Baynes became an assistant district attorney in the Albany D.A.'s Office in 1995.  (Doc.

180 at 13).  From 2000 to 2004, Baynes was in charge of the street crimes unit (which dealt

primarily with drug offenses involving cocaine, crack cocaine, marijuana, heroin, and ecstasy).

(Doc. 180 at 19-21).[12]  In 2005, Baynes became the head of the white collar/financial crimes unit.

(Doc. 244 at 1).  Prior to the case against Plaintiffs and their purported co-conspirators, Baynes

had never prosecuted a felony case involving prescription drugs and licensed pharmacists.

### Haskins[13]

Haskins was a peace officer with the New York Bureau of Narcotics Enforcement.  Prior to

the Signature case, Haskins had worked with Baynes on an unrelated case involving a New York

doctor who was writing prescriptions for anabolic steroids.  (Doc. 247 at 3); (Doc. 184-3 at 2-3).

Although the Albany D.A.'s Office had its own investigators, Soares and Baynes worked

almost exclusively with Haskins on the Signature case.  They provided Haskins with office space

---

been practicing law for four years, having graduated from Albany Law School in 1999.

[12]Less than 10% of the cases in the street crimes unit (which was formerly known as the "narcotics unit") involved the abuse of prescription pain killers and the unit very rarely dealt with steroids, oxycodone, hydrocodone, or barbiturates. (Doc. 180 at 21-22).

[13]As noted, *supra*, the Court will address Haskins' Motion for Summary by separate order. Haskins is discussed herein to provide necessary context for the instant Order.

in the Albany D.A.'s Office, supplied him with cash for making controlled buys, and issued him a cellular phone. (Doc. 247 at 9).[14]

### Albany D.A.'s Office – Albany County

The Albany D.A.'s Office is a local governmental body coextensive with Albany County, New York.[15] (Doc. 305 at 9-10). Soares is responsible for creating and making policy for the Albany D.A.'s Office and bears the "ultimate responsibility for everything that happens" in the office. (Doc. 168 at 66-67 and 135; Soares Dep. at 73-74 and 148).

The Albany D.A.'s Office has no written policies or procedures. (Doc. 168 at 67; Soares Dep. at 75). It provides no written guidance or training to its prosecutors as to the manner in which they, *inter alia*, prosecute cases, present indictments to grand juries, or deal with the media during an active prosecution. (Doc. 247 at 3, n.3). The office does not conduct any performance reviews and does not evaluate the work of its prosecutors before grand juries. (Doc. 247 at 3, n.3). Although he employs a press secretary, Soares is responsible for what goes on the Albany D.A.'s Office's web site.

---

[14]In February 2009, the New York Bureau of Narcotics Enforcement suspended Haskins and conducted an internal investigation into, *inter alia*, his alleged misconduct in "Operation Which Doctor," the name given by law enforcement to the investigation of Signature and its alleged co-conspirators. (Doc. 184 at 171-187 and 303-34; Haskins Depo. at 170-186 and 302-303). Haskins resigned in April 2009.

[15]On June 21, 2010, the Court directed Soares to Show Cause, *inter alia*, why the Albany D.A.'s Office was not an arm of the State of New York and should not therefore be found to have waived its right to sovereign immunity under the Eleventh Amendment to the U.S. Constitution. (Doc. 302). In his response, Soares represents that, despite some New York case law to the contrary, he and the Albany D.A.'s Office are *not* arms of the State but, in fact, local entities that are "coextensive with the County of Albany." (Doc. 305). Accordingly, the Court has construed Plaintiffs' claims against the Albany D.A.'s Office as being asserted against the County. (Doc. 311).

**B. The Investigation, Indictments and Arrests**

In May 2006, Baynes and Haskins attended a briefing given by the U.S. Drug Enforcement Agency ("DEA") in Dallas, Texas.[16]  (Doc. 247 at 3).  At the briefing, Baynes and Haskins met Wright, an agent with the Orlando Metropolitan Bureau of Investigation ("MBI")[17] who had been investigating Signature in Orlando, Florida.[18]  After learning that the DEA and MBI were attempting to build a case against Signature, Baynes and Haskins agreed to join the investigation, (Doc. 247 at 3), focusing putatively on Signature's criminal conduct in Albany County, New York.[19]  From that point forward, Baynes, Haskins and Wright agreed to share information about Signature on a weekly basis and dubbed the investigation "Operation Which Doctor."  (Doc. 246 at 3).

On August 4, 2006, Wright presented an application for a wiretap, and probable cause affidavit in support thereof, to the Ninth Circuit Court, in and for Orange and Osceola Counties, Florida (the "Florida State Court").  (Doc. 246 at 4 and Doc. 247 at 4).  According to Plaintiffs, the

---

[16]Although not entirely clear, it appears as though the briefing was an "intelligence-sharing" meeting concerning efforts by law enforcement from around the country to crack down on prescription sales of anabolic steroids and human growth hormone.  (Doc. 184-3 at 3).

[17]MBI is an Orlando-based multi-agency task force that brings together Federal, State and local law enforcement agencies to target . . . criminal enterprises" in Central Florida  (Doc. 246 at 2).

[18]The DEA, MBI, Florida Office of Statewide Prosecutor and other law enforcement officers in Florida had begun a coordinated investigation into Signature in November 2005.  (Doc. 247 at 1). Wright was the lead agent for the case.

[19]The Individual Plaintiffs never set foot in the State of New York prior to their arraignment and Signature had no physical presence in New York.  New York simply appears to have been just one of the many States to which Signature shipped or filled prescriptions.  In short, there is nothing in the record to suggest that Signature had any unique or particular nexus to the State of New York or Albany County.  That the Albany D.A.'s Office would participate in an investigation – and later attempt to prosecute a case – of this magnitude is baffling.  According to Plaintiffs' theory of the case, Soares' was motivated, in significant part, by the significant media attention that he and the case garnered.

wiretap application contained no fewer than 21 false or misleading material statements or omissions and, in the absence/presence of these statements, the application lacked probable cause and otherwise failed to comply with Florida law. (Doc. 247 at 4-8).[20] The Florida State Court entered an order approving the wiretap that same day and Signature's phone and fax lines were monitored for the next 60 days. (Doc. 129-10 at 17).

On September 25 and 26, 2006, Soares, Baynes and Haskins traveled to Orlando and met with Wright and others at MBI's offices to formulate a plan to take down Signature. (Doc. 247 at 8). At the meeting, Soares promised to "shut the operation down" and imprison anyone involved, (Doc. 184-3 at 26), and everyone agreed that:

> [A]lthough there [had] been a significant federal presence in the case . . . the case would be prosecuted and handled primarily by Florida and New York. The tentative plan would be for NY [to] prepare their Enterprise Corruption case and indict everyone involved. Shortly thereafter[,] when Florida [was] prepared to execute their search and seizure warrants . . . the indictments in the NYS case would be unsealed and everyone arrested and brought to New York. This would divide [Signature's] resources and force them to conduct two difficult cases on different fronts without any possibility of a double jeopardy issue because the case in New York would be based solely on acts committed in New York and not the [S]tate of Florida.

(Doc. 184-3 at 27-28).

In the fall of 2006, Defendants began a public relations campaign by attempting to connect Signature to professional athletes who were allegedly taking steroids and made deals with various media outlets to scoop the story.[21] (Doc. 247 at 8). In December 2006, Haskins and Wright

---

[20]As in its prior Order, the Court has simply assumed – without deciding and in taking all reasonable inferences in favor of Plaintiffs – that the wiretap was issued without probable cause. (Doc. 287).

[21]In the months that followed, media from around the country would implicate or mention numerous professional athletes and celebrities in connection with "Operation Which Doctor," including: Evander Holyfield, Jose Canseco, Los Angeles Angels center fielder Gary Matthews, Jr., Arizona Diamondbacks pitcher Jason Grimsley, John Rocker, Scott Schoeneweis, Pittsburgh Steelers team doctor Richard Rydze, Sylvester Stallone, and Chris Benoit.

traveled to Pennsylvania and questioned the Pittsburgh Steeler's team doctor.[22]  (Doc. 247 at 8).

That same month, Baynes, Haskins and Wright met with Brendan Lyons, a reporter with the

Albany Times Union, and another reporter from Sports Illustrated,[23] at the Albany D.A.'s Office.

(Doc. 247 at 8-9).  They agreed to give Lyons the scoop on the Signature case and the Albany

Times Union later published its exclusive article minutes before the raids on Signature's premises.

(Doc. 247 at 9).

   For several weeks in the latter part of December 2006 and January 2007, Baynes appeared

before a grand jury at the County Court in and for Albany County, New York (the "New York

State Court").  *People v. Calvert*, No. 2-1311, slip op. at 2 (N.Y. Co. Ct. Sept. 11, 2008), *aff'd, in*

*significant part*, *sub nom. People v. Loomis*, 896 N.Y.S.2d 208 (N.Y. App. Div. 2010); (Doc.

247 at 10).  The presentation was based, in significant part, on Wright's wiretap, as well as

Wright's and Haskin's live testimony.  According to Plaintiffs, Baynes made dozens of misleading

material statements or omissions before the grand jury.[24]  (Doc. 247 at 10-11).  Among other

things, Plaintiffs note that Baynes failed to instruct the grand jury that pharmacists have an

absolute defense under N.Y. PENAL LAW § 178.05;[25] misstated the law as to the criminality of

---

[22]To secure the interview with the team's doctor, Haskins and Wright appear to have posed as federal law enforcement officers and concealed the fact that they had no jurisdiction in the State of Pennsylvania.  (Doc. 252-3 at 58-62).

[23]The reporter from Sports Illustrated later accompanied Haskins on a raid of a medical clinic in Palm Beach County, Florida that was portrayed as a co-conspirator of Signature.  (Doc. 247 at 9).  The raid on the clinic in Palm Beach occurred on the same day as the raids on Signature and clearly appears to have been coordinated.

[24]Plaintiffs do not assert any claims arising out of Baynes' statements or presentments to the grand jury and concede that Baynes would have absolute immunity on any such claims.  (Doc. 207 at 9).  To the extent that the grand jury's indictments may not have been supported by probable cause, however, Plaintiffs assail Baynes' presentation and the testimony of Haskins and Wright.

[25]In pertinent part, § 178.05 provides that the provisions of New York's criminal diversion of prescription medication statute do not apply to "a duly licensed pharmacist acting in good faith in the

filling a prescription from a physician who does not reside in the same geographic area as his patient; failed to instruct the grand jury as to any limitations on accessorial conduct; misinstructed the grand jury that "anastrozole" was a controlled substance (a necessary element for the second count of the indictment); presented false and misleading evidence from the wiretap (including a statement that was falsely attributed to Mike Loomis); presented documentary evidence written in Spanish without providing an English translation; introduced hundreds of pages of documents concerning an entirely different pharmacy in Florida that was wholly unrelated to Signature; and called Haskins and Wright to provide false, misleading or inflammatory testimony.[26]  (Doc. 247 at 11).

On January 25, 2007, the grand jury returned its first indictment against Stan Loomis, Naomi Loomis, Kenneth Loomis, Calvert and "a.k.a. Signature Pharmacy."[27]  (Doc. 180-1).  A week later, however, the New York grand jury returned a superseding indictment.  (Doc. 168-6); (Doc. 244 at 3).  The first indictment failed, *inter alia*, to include any of the 19 pattern acts on which the enterprise corruption count was predicated.  (Doc. 247 at 10); *compare* (Doc. 180-1)

---

lawful course of the practice of pharmacy."  N.Y. PENAL LAW § 178.05(1)(b).  At the time the Albany D.A.'s Office secured its first indictment against the Individual Plaintiffs, through the date of his deposition in April 2009, Soares was unaware of the fact that the Loomises were licensed pharmacists (in both the State of New York and Florida, as well as federally, by the DEA); nor did Soares' know that Signature assisted the New York Department of Health in an investigation of a doctor in 2005.  (Doc. 168 at 304-308; Soares Dep. at 333-337).  It is unclear whether Baynes possessed this knowledge at the time he first presented to the grand jury; at some point during the investigation, however, he obtained a copy of Signature's licenses.  (Doc. 180 at 195).

[26]Plaintiffs identify "82 misstatements and mischaracterizations by Haskins during the grand jury proceedings," 29 of which occurred in connection with the first indictment.  (Doc. 247 at 11, n. 10).

[27]The inclusion of "a.k.a. Signature Pharmacy," which the New York State Court considered a formal defendant, was dropped in the fourth indictment.  *Calvert*, No. 2-1311. slip op. at 4-5.  Notwithstanding the inclusion of "a.k.a. Signature Pharmacy," Signature Pharmacy, Inc. was never indicted.  (Doc. 180 at 311).  It is unclear the extent to which "a.k.a. Signature Pharmacy" may have confused the grand juries.

*with* (Doc. 168-6). Although the New York State Court observed that the "second indictment did not differ materially from the first indictment," it also found that the second indictment "dropped one count of Criminal Possession of a Controlled Substance in the Fifth Degree, added one count of Criminal Diversion of Prescriptions in the Second Degree and changed the Insurance Fraud count from the second to the third degree." *Calvert*, No. 2-1311, slip op. at 3; (Doc. 247 at 10-11).[28]

On February 14, 2007, the New York State Court issued arrest warrants for the Loomises and Calvert on the grand jury's first – but not the superseding – indictment. (Doc. 129-2). It is unclear whether the New York State Court was aware of the superseding indictment at the time it issued the arrest warrants on the superseded indictment and whether the warrants were even valid under New York law.[29]

---

[28]Between the fall of 2007 and summer of 2008, Baynes would return to the grand jury for a third and fourth indictment. As described by the appellate court in New York: "In May 2008, after a lengthy course of proceedings-including three previous indictments [the second and third indictments were superseding indictments] before two different grand juries-a 33-count indictment (. . .the fourth indictment) was returned. [The New York State Court] previously dismissed 11 counts of the third indictment, but granted the people leave to re-present. In May 2008, the People reconvened the grand jury, which had returned the third indictment in October 2007 and presented new evidence and a new indictment. Following the grand jury's return of the fourth indictment, [the New York State Court] again entertained motions to dismiss and, after having released the grand jury minutes, dismissed the fourth indictment in its entirety. . . ." *Loomis*, 896 N.Y.S.2d at 209. As noted, *supra*, the appellate court affirmed the dismissal of the fourth indictment but modified the trial court's order by allowing the prosecution to re-present the charges. *Id.* at 211. On March 15, 2010, Soares moved to vacate the appellate court's opinion. (Doc. 245-3). It is unclear whether Soares abandoned the motion or the appellate court disposed of it, but on June 16, 2010, Plaintiffs were indicted for a fifth time. (Doc. 304-1).

[29]The parties failed to address this issue. For its part, the Court has been unable to find any New York decision addressing the effect (if any) of a superseding indictment on the validity of an arrest warrant issued by a superior court pursuant to N.Y. CPL § 210.10 on a prior, superseded indictment. For purposes of this Order, the Court has simply assumed – without deciding and taking all reasonable inferences in the light most favorable to Plaintiffs – that the New York arrest warrants were invalid as a matter of law.

At approximately 8:00 p.m. on February 26, 2007, Wright applied for three search warrants from the Florida State Court.[30] (Doc. 247 at 11-12). Approximately one hour later, Wright emerged with signed copies of all three warrants. (Doc. 247 at 12). According to Plaintiffs, Wright's affidavit "carried over many of the falsities, omissions, and misstatements" that were included in the wiretap application, (Doc. 247 at 12), and failed to established probable cause that evidence of a crime would be found at Signature's premises. (Doc. 250). As discussed in detail in the Court's prior Order, the search warrants failed to comply with the particularity requirements of the Fourth Amendment and were invalid on their face. (Doc. 287).

On the morning of February 27, 2007, Soares and Baynes – who had once again left Albany County New York to come Florida – assisted Wright and other law enforcement agents in executing the search warrants at Signature's Orlando and Winter Park locations.[31] In MBI's Operation Plan for the raids, Soares was listed as a "COMMANDER" and Baynes was assigned to "INTERVIEWS."[32] (Doc. 241-9). They arrived at the premises with large U-Haul trucks and proceeded to seize virtually everything within Signature's stores.[33] Soares and Baynes reviewed

---

[30]Other than a need to ensure that the raids on Signature were coordinated with the media and the raids on the clinic in Palm Beach, there is no satisfactory explanation as to why Wright waited until the last minute to apply for these warrants. At this point, the investigation of Signature had been ongoing for several years and there was no exigent reason to act hastily.

[31]The third search warrant, which has not been material to this litigation, was executed at a separate location that housed some of Signature's computer servers.

[32]Soares and Baynes contend that they were present simply to meet with potential cooperating witnesses.

[33]As noted in the Court's prior Order, agents seized, *inter alia*: Attorney client information/documents; computers, hard drives, DVRs and power supplies; more than 200,000 patient prescriptions that Signature had filled since 2002; general business records, tax returns, corporate notebooks, financial records, ledgers, bank transactions, licenses, permits and expense reports; current accounts payable, drug invoices, credit card invoices, check payments, and wire transfer requests; billing statements, rebate forms and shipping invoices/records; insurance reimbursement statements; medicare information and other health insurance information; customer phone lists; patient

documents during the raids and caused Signature's employees, who were being held by local law enforcement in a large conference room, to be led into a separate room so that Soares and Baynes could question each employee one by one.[34]  (Doc. 247 at 13).

On the day of the raids, the Loomises[35] and Calvert were arrested by OPD officers at the direction of Soares[36] and Wright.  (Doc. 247 at 13-14).  The sole basis for the arrests was the New York arrest warrants.  (Tr. at 8-9).[37]  Despite repeated requests from their counsel, who were called

---

compliance information; correspondence, planners, Rolodexes; blank prescription and bottle labels; inventory lists; vendor files; trade show/press kits; investment documents; doctor contact, marketing, and conference information; compounding formulas; shredded documents; pharmaceuticals (including Crestor, Stanozol, Nandrolone Decanoate, Testosterone, Testosterone Cypionate, Testosterone Enanthanate, Sustanon Testosterone, Depo-Testosterone, Somatropin, Steno-testosterone, Testosterone Propionate, Human Chorionic Gonadotropin, Phentermine hydrochlorine, Oxandrolone, Oxymetholone, Ketamine, Sildenafil, and Andralone); and all of Signature's electronically-stored data.  (Docs. 174-16 and 174-17); (Doc. 247 at 13).  In short, everything essential to Signature's business.  (Doc. 247 at 13); (Doc. 198, ¶¶ 16-17).

A few weeks after the seizure, interns at the Albany D.A.'s Office began pouring through Signature's records and patient information, setting aside records that they thought were "interesting." (Doc. 247 at 17).  The New York Defendants then met with representatives from Major League Baseball, the National Football League and World Wrestling Entertainment and apparently provided them with the private patient information.  (Doc. 247 at 17).  On April 5, 2007, however, the Florida State Court sealed all of the records.  (Doc. 245-2).  It is unclear whether the New York Defendants ever violated the seal order.

[34]Plaintiffs' police practices expert has opined that Soares' and Baynes' activities during the raids amounted to investigative/law enforcement activities.  (Doc. 143-1).  The New York Defendants, however, have moved to exclude Plaintiffs' police practices expert.  (Doc. 152).  Because the Court has not yet ruled on the New York Defendants' motion or made a *Daubert* determination, the Court has not relied upon the testimony of Plaintiffs' police practices expert in resolving the instant Motion.

[35]The Loomises were not at the store on the day of the raids and, notwithstanding their repeated offers to voluntarily surrender weeks earlier (which were conveyed by New York counsel), were directed to come to the store on Kuhl Avenue so that they could be arrested in the presence of the media.  (Doc. 198).

[36]During his deposition, Soares testified that the Loomises and Calvert would not have been arrested unless it was pursuant to his direction.  (Doc. 168 at 341-42; Soares Depo. at 374).

[37]According to the arrest affidavits prepared by OPD, (Doc. 129-9 at 1-4), the Loomises and Calvert were arrested without any Florida warrant pursuant to FLA. STAT. § 941.14, a provision of Florida's Uniform Interstate Extradition statute that provides:

to the scene during the raids, the Loomises and Calvert were not provided with a copy of the New York warrants.  (Doc. 247 at 14); (Doc. 195).  Indeed, neither Soares nor Baynes brought copies of the warrants with them to Florida and no one at OPD, MBI or the DEA ever received a copy of the warrants prior to the arrests.  Although at least two officers were apparently told that OPD had received a National Crime Information Center ("NCIC") teletype hit on the New York warrants, (Doc. 129-9 at 3-4), there is no record of the New York warrants ever having been entered into NCIC or that a dispatcher at OPD ever requested – much less received – a teletype hit on the New York warrants prior to the arrests.  Soares and Baynes simply informed Wright that valid New York warrants existed.  (Doc. 127-3 at 55); (Tr. at 11).[38]  It was not until at least a day after the Loomises and Calvert were arrested, and after they were processed at the Orange County Jail, that any law enforcement agency in Florida ever received a copy of the New York warrants (and only then, by facsimile).  (Tr. at 11-12).  Notwithstanding the magnitude of the case, the significant national media interest which had been created, and the fact that the Loomises and Calvert had never been in New York, there is no evidence that Soares or Baynes made any effort to comply

<hr>

The arrest of a person may be lawfully made also by any peace officer or a private person, without a [Florida] warrant upon reasonable information that the accused stands charged in the courts of a state with a crime punishable by death or imprisonment for a term exceeding 1 year, but when so arrested the accused must be taken before a judge with all practicable speed and complaint must be made against the accused under oath setting forth the ground for the arrest as in the preceding section; and thereafter his or her answer shall be heard as if the accused had been arrested on a warrant.

FLA. STAT. § 941.14.  In contravention of the statute, the Loomises and Calvert do not appear to have been "taken before a judge with all practicable speed" and no complaint setting forth the basis for the arrests ever appears to have been made.

[38]Despite the foregoing, in their Statement of Material Facts, Soares and Baynes state that they "did not provide any direction or advice to law enforcement as to how agents should engage or proceed with the arrests."  (Doc. 244 at 5).  That statement is clearly belied by Soares deposition testimony.

with the Extradition Clause of the U.S. Constitution, 28 U.S.C. § 3182, or New York and Florida's uniform extradition statutes.[39]

The media presence during the raids and arrests was intense.[40]  (Doc. 247 at 14).  Before law enforcement even arrived at Signature's stores, Lyons – who was soon joined by others from the media – was already at the scene, apparently having been tipped off by Haskins, Baynes or Soares.  By the afternoon, there were local and national media outlets present with reporters, cameramen, and satellite trucks.  (Doc. 195 at 2, ¶4).  The Loomises and Calvert were handcuffed and made to exit the premises amidst a throng of reporters before being escorted to a patrol car.  (Doc. 247 at 14).  Later that day, Soares held a press conference in Signature's parking lot, (Doc. 255 at 5), and held another press conference a few hours later in Albany, New York.  His statements are discussed in further detail, *infra*.

On March 4, 2007, Haskins signed for the Loomises and Calvert at the Orange County jail and led a team of New York State and Albany D.A. officers in transporting the arrestees to Albany.[41]  (Doc. 247 at 15; Doc. 244 at 6).  As Plaintiffs were leaving the Orange County jail to be

---

[39]The formalities associated with extradition are not burdensome.  Indeed, the Supreme Court has construed the Extradition Clause and 28 U.S.C. § 3182 as requiring only a "summary and mandatory executive proceeding."  *Michigan v. Doran*, 439 U.S. 282, 288 (1978).  At a minimum, however, there must be some *documentary* evidence that a person has been charged with a crime in the demanding state, specifically a "copy of an indictment . . . or an affidavit made before a magistrate of any State."  28 U.S.C. § 3182; *Doran*, 439 U.S. at 288.

[40]News and footage of the arrests were provided on a national basis.  *See*, *e.g.*,  Nicholas Confessore et al., *Arrests Reflect a New Focus on Fighting Steroid Sales*, N.Y. Times, March 1, 2007, *available at* http://www.nytimes.com/2007/03/01/nyregion/01steroids.html; *NY investigation leads to raid of Orlando pharmacy*, ESPN, March 1, 2007, *available at* http://sports.espn.go.com/espn/ news/story?id=2781674; Brendan J. Lyons, *A web of easy steroids*, Alb. Times-Union, Feb. 28, 2007, *available with video footage at* http://www.timesunion.com/AspStories/story.asp?storyID= 567310&category=REGIONOTHER&BCCode=HOME&newsdate=2/28/2007.

[41]As noted, *supra*, Haskins was a "peace officer."  Plaintiffs contend that, under New York law, Haskins did not have the authority to make any arrests and was not authorized to transport Plaintiffs from Orlando to Albany.

put into a van that would take them to the airport, Haskins ordered everyone to throw away their personal belongings. (Doc. 244 at 6). Calvert, who had a Bible, asked Haskins if he really wanted him to throw his Bible in the trash. (Doc. 113-1 at 180-81). According to the New York Defendants, "Haskins said he was not going to tell Mr. Carlvert again and that he had to throw it . . . away and if he didn't, Haskins was going to handcuff him behind his back." (Doc. 244 at 6).[42] During the flight, Haskins sat next to Mrs. Loomis (whom Haskins and other New York officers had separated from Stan Loomis, her husband). (Doc. 244 at 7). He lifted up the armrest between himself and Mrs. Loomis and rubbed up against her body while talking to others on the plane. (Doc. 244 at 7). At another point during the flight, Haskins picked up a Maxim men's magazine[43] and proceeded to "joke" about how big his "gun" was. (Doc. 244 at 7).[44]

After arriving in Albany, the Loomises and Calvert spent the night in jail and were arraigned the next day in front of another significant media presence (this time, the media were waiting in the courtroom and recorded Plaintiffs approaching the podium in shackles and bright orange jumpsuits). Plaintiffs posted bond, were immediately released, and flew home to Florida that same day (i.e., on March 5, 2007).

Since the raids and arrests, Signature has been unable to conduct any pharmacy business, its reputation having been severely damaged and its inventory, business records and other items

---

[42]According to Calvert, Haskins said "I don't give a shit what you do with [your Bible]" but you have to "throw it away." (Doc. 113-1 at 180).

[43]Maxim magazine contains pictures of semi-nude women; its website is entitled, *inter alia*, "Hot Girls, Sexy Photos & Videos . . . ." *See* http://www.maxim.com/.

[44]Some months prior to the arrests, while interviewing one of Signature's customers in New York, Haskins had said he was going to "go after Signature" and, in particular, Mrs. Loomis, "you know – the girl with the big tits." (Doc. 247 at 10). Mrs. Loomis was aware of that comment prior to the flight with Haskins and testified that she was severely uncomfortable in Haskins' presence. (Doc. 110-1 at 123 and 134).

essential to its operations having been unlawfully retained by law enforcement for nearly three years. (Doc. 247 at 20). Although it was never found guilty of any crime, Signature's bank and merchant accounts were frozen, and its shipping accounts with Federal Express were suspended. Calvert and Mike Loomis have remain unemployed. (Doc. 247 at 20). To this day, however, the Loomises remain licensed pharmacists and no administrative action was ever taken against them.

## C. Statements to the Press

Soares and Baynes repeatedly made out-of-court statements and disseminated information to the press which Plaintiffs contend were, *inter alia*, defamatory.[45] The following is a portion of what was covered in the press:

- On February 27, 2007, the day of the raids and Soares' first press conference, Soares is quoted by Lyons in the Albany Times Union as stating "Signature did an estimated $10 million in business in New York last year;" and that while critics might question why a local New York prosecutor would pursue this case, "We're arresting young men on street corners every day for selling drugs." "Signature did $30 million last year . . . $250,000 in Albany County."[46] (Doc. 198-1 at 2).

- Baynes is quoted in the same article as saying "It's a complete perversion of the medical system." (Doc. 198-1 at 2).

- On February 28, 2007, ESPN reports that an "illicit steroid distribution network, which may be responsible for Internet sales of performance-enhancing drugs nationwide, has been targeted by an upstate New York prosecutor" and quotes Soares as stating "We have investigated, and are prosecuting, one of the largest narcotics[47] and steroid distributors in the nation."

---

[45]There is some argument in the parties' briefs that these statements also had the effect of poisoning the potential jury venire and otherwise materially prejudicing their right to an impartial trial. (*See, e.g.*, Doc. 161 at 13). As noted, *supra*, in footnote 7, however, Plaintiffs have not asserted a ripe claim for violations of their right to an impartial trial under the Sixth Amendment.

[46]When asked to substantiate those figures during his deposition, Soares testified that he was not relying on any specific information when he made the statement, but that he had simply made some estimates based on the number of putative customers that he "believed were . . . in Albany County" and Signature's "average billing" information. (Doc. 168 at 330; Soares Depo. at. 362).

[47]The Individual Plaintiffs were never indicted or charged with any crime involving illegal narcotics and there is no evidence whatsoever that Signature sold "illegal narcotics."

ESPN goes on to state that "According to Albany prosecutors, Signature Pharmacy repeatedly filled prescriptions even though it knew they were not the result of face-to-face meetings between doctor and patient, a violation of New York law,"[48] and that Signature was a "producer"[49] of illegally distributed drugs.  (Doc. 198-1 at 20).

• On March 5, 2007, the day of the arraignment, Soares told USA Today that "Signature filled prescriptions, in some cases from unlicensed doctors, knowing they had not examined patients" and the Albany D.A.'s Office stated that "at least $250,000 in illegal[50] and controlled substances were sold directly in Albany County, and New York sales exceeded $10 million."  (Doc. 198-1 at 7).

• On March 6, 2007, Lyons reported in the Albany Times Union that professional athletes and other customers of Signature "could be called as witnesses should the sprawling criminal case go to trial" and that courtrooms on the previous day "were bristling with high-priced Albany defense attorneys retained to represent the out-of-state defendants" who had arrived in "jail jumpsuits, looking haggard and weary after spending nearly a week in custody."

Lyons also wrote:  "Investigators were removing documents and drugs from Signature Pharmacy last Tuesday when a truck from a document-shredding company showed up at the pharmacy for a pre-scheduled appointment" and quotes Soares as stating "many" professional athletes may have purchased steroids and other performance-enhancing drugs from Signature Pharmacy.[51]

_____

[48]When asked whether New York law required a doctor to examine a patient before writing a prescription, Soares could not identify a *single* New York statute that required such an examination and stated only that were "regulations" (which he also could not identify) issued by the New York Department of Health.  (Doc. 168 at 344-45; Soares Depo. at 377-78).

[49]According to Plaintiffs, they were never charged with "producing" or manufacturing drugs.

[50]Anabolic steroids and human growth hormone are Schedule II controlled substances under New York law and may lawfully be prescribed by a doctor and dispensed by a pharmacist.  *See* N.Y. PUB. HEALTH §§ 3306 and 3331(2).  There was (and has been) no evidence that Signature sold "illegal" substances to individuals in Albany County, New York (or anywhere else for that matter).

[51]A few days earlier, the Associated Press and ESPN reported that investigators found "a 'raid card' at numerous Signature Pharmacy employees' desks with contact information for lawyers.  The top of the documents identified it as a Food and Drug Administration/Drug Enforcement Agency telephone list, but only lawyers were on the card."  Carl Metzger, the chief of MBI, was quoted as saying "We found that to be somewhat interesting;" "Why would you need to have something entitled a phone call list for the DEA and FDA with lawyers' names if you have nothing to hide?"  ESPN News Service, *NY Investigation Leads to Raid of Orlando Pharmacy*, available at http://sports.espn.go.com/espn/news/story?id=2781674.

Soares is now quoted as saying that Signature did "about $10 million" in sales in New York in the past two years – not in the past year as Soares previously stated on February 27, 2007.  (Doc. 198-1 at 8-10).

- In an undated March 2007 press release,[52] the Albany D.A.'s Office wrote: "In New York State, a doctor may not prescribe a drug unless they conduct a face-to-face diagnostic examination of the patient, and a pharmacy may not dispense a prescription without a valid prescription."[53]  (Doc. 198-1 at 12).

- In another undated March 2007 press release, labeled "Second 'Operation Which Doctor' Defendant Pleads Guilty – AJ Peterson Pleads Guilty to Felony, Agrees to Cooperate in Signature Case," the Albany D.A.'s Office wrote: "Aaron Peterson is the second defendant to plead guilty in connection with 'Operation Which Doctor' and he will not be the last."

  The press release goes on to state: "In New York State, a doctor may not prescribe a drug unless they conduct a face-to-face diagnostic examination of the patient, and a pharmacy may not dispense a prescription without a valid prescription."  (Doc. 198-1 at 12).

- In another undated March 2007 press release labeled "Two More 'Operation Which Doctor' Defendant [sic] Pleads [sic] Guilty – Monday Miller and Eugene Bolton Plead Guilty, Agree to Fully Cooperate in Case Against Signature Pharmacy,"[54] Soares is quoted as saying "Today is a significant day in the case against Signature Pharmacy;" "The statements made in court this morning by the two cooperating defendants shed new light on the intricacies of 'Operation Which Doctor'. [sic] We look forward to continuing to prosecute those responsible for providing illegal narcotics and controlled substances to the people of Albany County."

  The press release goes on to state that Dr. Bolton attempted to sell a prescription when he "never examined the patient" and states "In New York State, a doctor may not prescribe a drug unless they conduct a face-to-face diagnostic examination of the patient, and a pharmacy may not dispense a prescription without a valid prescription."  (Doc. 198-1 at 15).

---

[52]All of the press releases from the Albany D.A.'s Office discussed herein were posted on the web site of the Albany D.A.'s Office.

[53]Again, there does not appear to have been any law in New York that required doctors to have a "face-to-face diagnostic examination" with a patient before writing a valid prescription. Furthermore, New York law does not appear to require a pharmacist to verify that a patient had a "face-to-face diagnostic examination" with a doctor before filing a prescription.

[54]As noted, *supra*, Signature Pharmacy, Inc. was never indicted or otherwise charged with any crime.

• On March 6, 2007, Soares is quoted by the Baltimore Sun as stating that "We were able to take down one of the country's largest pharmaceutical, steroid, human-growth-hormone centers." (Doc. 198-1 at 41).

• On January 13, 2008, Lyons reported in the Albany Times Union that "Soares said his decision more than two years ago to pursue the case was less about exposing the drug uses of athletes or celebrities and more about dismantling a drug pipeline that has funneled millions of dollars in steroids and other drugs into New York. The state has some of the strictest prescription drug laws in the country and prosecutors said it's unlawful here for a physician, even from another state, to prescribe drugs to a New York patient they have never examined."

Lyons further writes: "Soares, who is in his inaugural term as district attorney, compares the Internet-fueled industry to the powerful cocaine cartels of the 1980s. He pointed out that Stan and Naomi Loomis, the husband and wife owners of the brick-and-mortar Signature pharmacy, own multimillion dollar properties and a fleet of expensive sports cars and boats."

Lyons then quotes Soares as stating: "They're living the lifestyle of the Tony Montanas of the '70s and '80s because they're drug dealers" and explains that Soares was "referring to the character made famous by Al Pacino in the movie Scarface." (Doc. 198-1 at 29).

• On March 13, 2008, Michael Mooney reported in the Miami New Times that "District Attorney Soares' office continues to pursue what it says is a vast criminal enterprise. On the D.A.'s website, www.albanycountyda.com, visitors can view a Mafia-style flow chart of Operation Which Doctor targets with headshots of the charged participants. . . . [I]n the center is Signature Pharmacy. Over some of the pictures . . . are diagonal red stamps that say 'Pled Guilty.'" (Doc. 198-1 at 39).

Soares is quoted as saying "The idea that an individual no longer has to travel to neighborhoods to purchase narcotics and can get them delivered to their door because of the computer that sits in their office or bedroom is a frightening thought." (Doc. 198-1 at 38).

On January 18, 2008, the New York State Court granted the Loomises' motion to enter a gag order, which directed "all attorneys and investigators associated" with the case not to make any comments to "any media outlets with the exception of matters relating to scheduling and/or otherwise generic information." (Doc. 207-2).[55]

_____

[55]It is unclear whether any of the statements or information discussed in Michael Mooney's March 13, 2008 article violated the January 18, 2008 gag order.

### III.  Applicable Law

#### A.  Summary Judgment

A party is entitled to summary judgment when it can show that there is no genuine issue as to any material fact.  FED. R. CIV. P. 56(c); *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994).  Which facts are material depends on the substantive law applicable to the case.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  The moving party bears the burden of showing that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Servs., Inc.*, 252 F. Supp. 2d 1347, 1351-52 (M.D. Fla. 2003).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324-25 (internal quotations and citations omitted). Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish a genuine issue of fact for trial.  *Id.* at 322, 324-25; *Watson*, 252 F. Supp. 2d at 1352.  The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts.  *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value") (citations omitted); *Broadway v. City of Montgomery, Ala.*, 530 F.2d 657, 660 (5th Cir. 1976).

In determining whether the moving party has satisfied its burden, the Court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolves all reasonable doubts against the moving party.  *Anderson*, 477 U.S. at 255.

The Court is not, however, required to accept all of the nonmovant's factual characterizations and legal arguments. *Beal*, 20 F.3d at 458-59.

## B.  42 U.S.C. § 1983

Actions to remedy a violation of the U.S. Constitution by a state actor are enabled through 42 U.S.C. § 1983.  To sustain a § 1983 claim, a plaintiff must establish that: (1) he suffered a deprivation of rights, privileges or immunities secured by the Constitution or laws of the United States; and (2) the act or omission causing the deprivation was committed by a person acting under color of law.  *See*, *e.g.*, *Wideman v. Shallowford Community Hosp. Inc.*, 826 F.2d 1030, 1032 (11th Cir. 1987). "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 (1979)).  Therefore, the first step in analyzing a § 1983 claim is to identify the specific constitutional right allegedly violated by the defendant.  *Id.*  Once the constitutional right is identified, the court must then apply the standard applicable to that particular provision to determine whether a constitutional violation actually occurred.  *Graham v. Connor*, 490 U.S. 386, 394 (1989).

## C.  Absolute Immunity

On its face, § 1983 "admits of no defense of official immunity."  *Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993); *see also Imbler v. Pachtman*, 424 U.S. 409, 417 (1976).  However, the U.S. Supreme Court has held that Congress "did not intend § 1983 to abrogate immunities 'well grounded in history and reason.'  Certain immunities were so well established in 1871, when § 1983 was enacted, that 'we presume that Congress would have specifically so provided had it wished to abolish' them."  *Fitzsimmons*, 509 U.S. at 268 (quoting *Pierson v. Ray*, 386 U.S. 547, 554-55 (1967)).  Accordingly, a government official bears the burden of demonstrating that the

conduct for which he seeks absolute immunity would have been privileged at common law in 1871. *Id*.; *see also*, *e.g.*, *Burns v. Reed*, 500 U.S. 478, 486 (1991).

With respect to prosecutors, in particular, these officials must establish that their actions were "intimately associated with the judicial phase of the criminal process." *Imber*, 424 U.S. at 430; *accord Rehberg v. Paulk*, 598 F.3d 1268, 1276 (11th Cir. 2010).  In making this assessment, courts employ a "functional approach," which looks to the nature of the function performed – not the identity of the actor who performed it.  *Van de Kamp v. Goldstein*, - - - U.S. - - -, 129 S. Ct. 855, 861 (2009); *Fitzsimmons*, 509 U.S. at 269 (citations omitted); *see also Kalina v. Fletcher*, 522 U.S. 118, 127 (1997).  Because prosecutors are essential to the criminal justice system, there is a significant concern that the "public trust of the prosecutor's office would suffer" if the prosecutor were "to have in mind his 'own potential' damages 'liability' when making prosecutorial decisions-as he might well were he subject to § 1983 liability." *Van de Kamp*, 129 S. Ct. at 860 (quotations and citations omitted).  At the same time, however, prosecutors stand unique "among officials whose acts could deprive persons of constitutional rights. . . ."  *Imber*, 424 U.S. at 429. For this reason, a prosecutor's absolute immunity reflects "'a balance of' 'evils.'"  *Van de Kamp*, 129 S. Ct. at 859 (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949) (Hand, C.J.)).

Absolute immunity applies to a prosecutor's actions in initiating a prosecution and in presenting the State's case.  *Imbler*, 424 U.S. at 431.  More specifically, courts have afforded prosecutors absolute immunity for appearances in court and other judicial proceedings, including prosecutorial conduct before grand juries and in presenting evidence to a judge in support of a search warrant, as well as for in-court statements made during trial.  *Van de Kamp*, 129 S.Ct. at 861; *Kalina*, 522 U.S. at 126; *Burns*, 500 U.S. at 490-92; *accord Rehberg*, 598 F.3d at 1276.  In short, "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for

trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity." *Kalina*, 522 U.S. at 126.

When a prosecutor steps beyond his role as an advocate for the state, however, he may not shield his conduct with absolute immunity and will, at most, be entitled to only qualified immunity. *Fitzsimmons*, 509 U.S. at 276; *Kalina*, 522 U.S. at 126. For example, a prosecutor will not be entitled to absolute immunity when he holds a press conference;[56] provides legal advice to the police during their pretrial investigation of the facts; fabricates evidence to secure an indictment; drafts a criminal complaint or application for an arrest warrant with malice and without probable cause; executes a raid on a private residence; or participates alongside the police in the execution of a search warrant. *Fitzsimmons*, 509 U.S. at 274-78; *Burns*, 500 U.S. at 492-96; *Malley v. Briggs*, 475 U.S. 335, 340-41 (1986); *Rowe v. City of Ft. Lauderdale*, 279 F.3d 1271, 1279-80 (11th Cir. 2002). As the Supreme Court has explained:

> There is a difference between the advocate's role in evaluating the evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand. When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.

*Kalina*, 522 U.S. at 127 (internal citations and quotations omitted).

Even where a prosecutor is entitled to absolute immunity, the public does not remain powerless to punish prosecutorial misconduct. *Imber*, 424 U.S. at 428-29. Indeed, prosecutors may be punished, criminally, for willful deprivations of constitutional rights and are also subject to

---

[56]With respect to out-of-court statements to the media, in particular, the Supreme Court appears to have categorically rejected the application of absolute immunity. *Fitzsimmons*, 509 U.S. at 277-78 ("Comments to the media have no functional tie to the judicial process. . . . The conduct of a press conference does not involve the initiation of a prosecution, the presentation of the state's case in court, or actions preparatory for these functions").

professional discipline. *Id.* (citing 18 U.S.C. § 242 and the ABA code of Professional Responsibility).

### D. Qualified Immunity

The doctrine of qualified immunity protects government and law enforcement officials from civil liability in the performance of "discretionary functions . . . insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Assuming the official can establish that he was acting within the scope of his discretionary authority, the burden then shifts to the plaintiff to show that the grant of qualified immunity is inappropriate. Under *Saucier v. Katz*, 533 U.S. 194 (2001), and *Pearson v. Callahan*, 555 U.S. - - -, 129 S. Ct. 808 (2009), an official is entitled to qualified immunity unless the plaintiff can demonstrate that: (1) the facts viewed in the light most favorable to the plaintiff establish a constitutional violation; and (2) the right at issue was "clearly established" at the time of the official's alleged misconduct.[57] *Pearson*, 129 S. Ct. at 815-16 (citing *Saucier*, 533 U.S. at 201); *see also*, *e.g.*, *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009). This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).

A government official acts within the scope of his discretionary authority if his actions were: (1) undertaken pursuant to the performance of his duties; and (2) within the scope of his authority. *See*, *e.g.*, *Lenz v. Winburn*, 51 F.3d 1540, 1545 (11th Cir. 1995). To establish these requirements, there must be more than "a bald assertion by the defendant that the complained-of actions were undertaken pursuant to the performance of his duties and within the scope of his discretionary authority; there must be a showing by competent summary judgment materials of

---

[57]Courts now have discretion to decide which prong of the inquiry to address first. *Pearson*, 129 S. Ct. at 818; *Rehberg v. Paulk*, 598 F.3d 1268, 1277 (11th Cir. 2010).

objective circumstances that would compel that conclusion."  *Barker v. Norman*, 651 F.2d 1107, 1124-25 (5th Cir. Unit A July 30, 1981).[58]

Within the Eleventh Circuit, a plaintiff may only rely on decisions of the U.S. Supreme Court, the Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose, for purposes of demonstrating that the right at issue was "clearly established."  *See, e.g.*, *McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007); *Wilson v. Strong*, 156 F.3d 1131, 1135 (11th Cir. 1998).  However, the Eleventh Circuit has suggested that where a violation occurs in another jurisdiction, a plaintiff may rely on that jurisdiction's sources of law.  *See, e.g.*, *Danley v. Allen*, 540 F.3d 1298, 1313 (11th Cir. 2008) ("a legal principle announced by a decision from a court with jurisdiction over the place where the violation of rights was committed" may serve to notify a public official that his actions will violate a constitutional right); *Goebert v. Lee County*, 510 F.3d 1312, 1330 (11th Cir. 2007) (recognizing "factually similar cases already decided by state and federal courts in the relevant jurisdiction" as "sources of law that would put a government official on notice of statutory or constitutional rights").  Within the Second Circuit, courts must look to decisions of the U.S. Supreme Court and the Second Circuit Court of Appeals.  *See, e.g.*, *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004); *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir. 2003); *Young v. County of Fulton*, 160 F.3d 899, 903 (2d Cir. 1998).[59]

---

[58]All decisions of the former Fifth Circuit handed down prior to October 1, 1981 are binding precedent within the Eleventh Circuit.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

[59]The parties failed to address whether Second Circuit or Eleventh Circuit precedent should be used in determining whether the rights at issue here were "clearly established."

## IV. Discussion

### A. Counts I and II – Unlawful Arrest Pursuant to § 1983

As the Court noted in its prior Order, Wright orchestrated the warrantless arrest of

Plaintiffs pursuant to FLA. STAT. § 941.14.[60] (Doc. 287 at 27). In doing so, he relied on directions

from Soares and Baynes that Plaintiffs should be arrested and that there were valid New York

warrants for Plaintiffs' arrest. Soares and Baynes, however, did not have any warrants in their

possession and, even assuming that they did, it is far from clear that the warrants were valid or

even supported by probable cause[61] – both as a matter of New York law governing the effect of a

superseding indictment on a previously issued warrant, and as matter of well established Second

Circuit precedent.[62]

---

[60]In their Motion, Soares and Baynes contend that Plaintiffs "were arrested pursuant to validly obtained [New York] arrest warrants." (Doc. 161 at 12). The contention is without merit. *See*, *e.g.*, 5 AM. JUR. 2D Arrest § 29 ("A warrant of arrest issued in one state may not be executed in another state, for it has no validity beyond the boundaries of the state by whose authority it was issued").

[61]The sole basis for probable cause identified in Soares' and Baynes' Motion is the New York arrest warrants. (Doc. 161 at 12).

[62]Although the Supreme Court has held that the Fourth Amendment's requirement that arrest warrants must be based upon probable cause may be satisfied by an indictment returned by a grand jury, *Kalina v. Fletcher*, 522 U.S. 118, 129 (1997) (citations omitted), in New York, the presumption of probable cause arising from a grand jury indictment is not necessarily a defense to an unlawful arrest claim under § 1983. *See McClellan v. Smith*, 439 F.3d 137, 145 (2d Cir. 2006) (citing *Broughton v. State*, 335 N.E.2d 310 (N.Y. 1975)); *Rivas v. Suffolk County*, Case Nos. 04-4813-pr, 04-5198-pr, 2008 WL 45406, at *1 (2d Cir. Jan. 3, 2008) (unpublished) ("In dismissing [Plaintiff's] § 1983 false arrest claim, the district court erred as a matter of law in holding that [Plaintiff's grand jury] indictment established a presumption of probable case. While such a presumption arises in malicious prosecution claims, the presumption is totally misplaced when applied in false arrest actions") (internal citations and quotations omitted); *see also Rothstein v. Carriere*, 373 F.3d 275, 282-83 (2d Cir. 2004) (citing *Colon v. City of New York*, 455 N.E.2d 1248 (N.Y. 1983) and noting that the presumption of probable cause incident to a grand jury indictment may be overcome by establishing that the indictment was the product of fraud, perjury, the suppression of evidence or other conduct undertaken in bad faith). Taking all reasonable inferences in favor of Plaintiffs, and assuming that the wiretap, other evidence presented to the grand jury, and misleading (if not false or legally impossible) instructions given to the grand jury were presented in bad faith, Plaintiffs have produced sufficient evidence from which a jury could conclude that the presumption normally afforded to a grand jury

Soares and Baynes are not entitled to absolute immunity on Plaintiffs' Unlawful Arrest claims. At the time of the arrests, Soares and Baynes were not engaged in any function that was intimately associated with the judicial phase of the New York criminal proceedings against Plaintiffs. They were a thousand miles from their jurisdiction and were participating in – indeed, Soares was purportedly "commanding" – a law enforcement raid on Signature's premises in Orlando, Florida, and directing law enforcement to carry out arrests.[63] Even assuming that they had some authority to execute or participate in the execution of Florida search warrants, Soares and Baynes had no judicial business in Florida.[64] On the contrary, taking all reasonable inferences in favor of Plaintiffs, Soares' and Baynes' activities on February 27, 2007 appear to have been focused in significant part on ensuring that Plaintiffs' arrests and the raids would be covered by the media.

On the present record, Soares and Baynes are also not entitled to qualified immunity. Although Wright could reasonably rely on information from Soares and Baynes – who were, in effect, acting as fellow investigative officers when they relayed information about the supposed New York arrest warrants – Soares and Baynes did not have arguable probable cause to direct Plaintiffs' arrests on February 27, 2007. As attorneys, and in particular, New York prosecutors, Soares and Baynes clearly should have known that arresting an individual in Florida who had never set foot in New York, and for whom there was no documentary evidence that a crime had

indictment has been overcome in this case.

[63]Plaintiffs do not assert that Soares or Baynes are not entitled to absolute immunity for their role in securing the indictments or supposed New York arrest warrants. Their claim is that Soares and Baynes actually carried out the arrests by commanding or directing Wright.

[64]If anything, the only judicial function Soares and Baynes could have performed in Florida would have been to assist the Florida State Court in carrying out a demand from New York to extradite Plaintiffs – a task Soares and Baynes eschewed in favor of making quick and highly publicized arrests.

been committed in the State of New York, was completely unreasonable. Under the totality of the circumstances, there is a substantial mixed question of law and fact as to whether any valid New York warrants existed on February 27, 2007 and, therefore, whether Soares and Baynes had arguable probable cause to order Wright and others to arrest Plaintiffs.

Accordingly, Defendants' Motion will be denied as to Plaintiffs' Unlawful Arrest claims in Counts I and II.

### B. Count III – *Monell* Claim Pursuant to § 1983

Plaintiffs' *Monell* claim is premised on, *inter alia*, the failure of the County's District Attorney and Assistant District Attorney to refrain from making unlawful arrests in contravention of the Fourth Amendment. (Doc. 3, ¶¶ 84-88).[65]

Counties and municipalities are "persons" for purposes of § 1983. *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 663 (1978). However, these local governmental bodies may not be held liable solely because they employ a tortfeasor. *See*, *e.g.*, *Bd. of County Comm'rs of Byrhan County, Okl. v. Brown*, 520 U.S. 397, 403 (1997). Liability attaches under § 1983 only to those actors who violate a plaintiff's rights. *Monell* at 690-91. Local governmental bodies can only be held liable under § 1983 where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation or decision officially adopted and

---

[65]In their Response, Plaintiffs also contend that the Albany D.A.'s Office "wholly failed to train and supervise its prosecutors *at all* and, in particular, in the specific areas of grand jury presentments and instructions, crimes involving prescriptions and the medical and pharmacy professions, and enterprise corruption. . . ." (Doc. 207 at 20-21). The Amended Complaint, however, refers only to Plaintiffs' right to be "secure from unlawful searches or unlawful restrain of their person and liberty" under the Fourth and Fourteenth Amendments to the U.S. Constitution, (Doc. 3, ¶ 84), and generally asserts that the Albany D.A.'s Office failed to train or supervise Soares and Baynes "in their duties to refrain from: (a) unlawfully and maliciously prosecuting the individual Plaintiffs; (b) conspiring to violate the rights, privileges, and immunities guaranteed to SIGNATURE and the Individual Plaintiffs by the Constitution and laws of the United States; and (c) otherwise depriving SIGNATURE and the Individual Plaintiffs of their constitutional and statutory rights, privileges, and immunities." (Doc. 3, ¶ 87).

promulgated by that body's officers" or is "visited pursuant to governmental custom even though such custom has not received formal approval through the body's official decisionmaking channels." *Id.* at 690-91.

The Supreme Court has further observed:

> [I]t is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances. . . .
>
> Indeed, any other conclusion would be inconsistent with the principles underlying § 1983. To be sure, "official policy" often refers to formal rules or understandings-often but not always committed to writing-that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time. That was the case in *Monell* itself . . . . However . . . a government frequently chooses a course of action tailored to a particular situation and not intended to control decisions in later situations. If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government "policy" as that term is commonly understood. More importantly, where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly. To deny compensation to the victim would therefore be contrary to the fundamental purpose of § 1983.

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986) (holding that decision by county prosecutor and sheriff to forcibly enter a doctor's office on a single occasion constituted an official policy or custom for purposes of imputing § 1983 liability on municipality).[66]

Here, there can be no question that Soares, an elected official, was a high-level official to whom the County delegated final policy and decision-making authority.[67] As the decisionmaker,

---

[66]*See also* 2 SHELDON NAHMOD, CIVIL RIGHTS AND CIVIL LIBERTIES LITIGATION: THE LAW OF SECTION 1983 § 6:9 (current through Sept. 2009) ("[W]here a high-ranking official of a local government body or a similar official in one of its departments declares or otherwise establishes a policy which, when executed by the official personally or by a subordinate, leads to a constitutional violation, the local government (as well as the official) may be liable under § 1983 even in the absence of a formally declared policy by the local government itself").

[67]In its Motion, the County argued: "Courts have been reluctant to impose the title of 'policymaker' to a county district attorney. . . . *As an official of the state*, a county attorney may not be considered a municipal policymaker. In New York State, a district attorney acting in an official prosecutorial capacity acts *upon behalf of the people of the state. . . .*" (Doc. 161 at 15, n.3) (citing

-31-

Soares not only participated in, but directed Baynes and others to violate Plaintiffs' Fourth

Amendment right to be free from unlawful arrests. Rather than wait for any documentary evidence

that Plaintiffs had committed a crime in New York and comply with the very limited requirements

of federal and state extradition statutes, Soares decided to orchestrate Plaintiffs' arrests without

valid New York warrants (and, in the process, garner significant media attention). Where a final

decisionmaker for a county deliberately eschews one course of action in favor of another and

directly causes a violation of the Fourth Amendment, the county may be held liable under § 1983.

*Pembaur*, 475 U.S. at 483-85. Based on the present record, Plaintiffs have presented sufficient

evidence from which a factfinder could conclude that Soares took precisely those decisions.

Accordingly, the Albany D.A.'s Office's Motion will be denied as to Plaintiffs' *Monell*

claim against Albany County in Count III.

### C. Count IV – Unlawful Conspiracy Claim Pursuant to § 1983

As the Court noted in its prior Order, Plaintiffs have not asserted a conspiracy claim

pursuant to § 1985 – their Unlawful Conspiracy claim is predicated solely on § 1983. (Doc. 287 at

29). The New York Defendants, as did Wright, failed to address Plaintiffs' Unlawful Conspiracy

claim in their Motion.

---

decisions of the Tenth Circuit Court of Appeals and a bankruptcy court) (emphasis added). In its Response to the Court's Order to Show Cause, however, Soares later represented that he "is district attorney for the County of Albany [only] . . . just as each separate and distinct county within the State of New York has its own locally elected district attorney whose jurisdiction is coextensive with that particular county only, *not with the whole of the state*," (Doc. 305 at 10, n. 1), and that a "district attorney *may not be considered a state official* . . . ." (Doc. 305 at 11) (emphasis added). Notwithstanding Soares' apparent confusion, the Second Circuit has made plain that District Attorneys are policymakers under New York law for purposes of § 1983. *See, e.g.*, *Myers v. County of Orange*, 157 F.3d 66, 76-77 (2d Cir. 1998) (citing, *inter alia*, *Claude H. v. County of Oneida*, 626 N.Y.S.2d 933, 935-36 (N.Y. App. Div. 1995) and noting that "county would be liable where DA 'directed the police to arrest and detain [plaintiff] without a warrant'"); *see also Walker v. City of New York*, 974 293 (2d Cir. 1992). Accordingly, the County's contention that Soares is not a policy- or decisionmaker for purposes of *Monell* liability is without merit.

Accordingly, the New York Defendants' Motion will be denied as to Plaintiffs' Unlawful Conspiracy claim in Count IV.

### D.  Count VIII – Injurious Falsehood Under Florida Common Law

Injurious falsehood[68] concerns the "intentional interference with another's economic relations." *Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 742 So. 2d 381, 386 (Fla. 4th DCA 1999) (quoting *Procacci v. Zacco*, 402 So. 2d 425, 426 (Fla. 4th DCA 1981) and citing W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 128 at 964 (5th ed. 1984)); *see also Sailboat Key, Inc. v. Gardner*, 378 So. 2d 47 (Fla. 3d DCA 1980).  Although the claim developed to redress damage to property, it also redresses damage to business interests from disparagement reflecting upon the business' existence or character, or the manner in which the business is conducted.  *Salit*, 742 So. 2d at 387-88 (citations omitted).

To establish a claim for injurious falsehood under Florida law, Signature must prove: (1) the publication or communication of (2) a falsehood (3) to a third party (4) when the publisher knew or reasonably should have known that the statement would likely influence others not to deal with Signature; (4) the falsehoods played a material and substantial part in inducing others not to deal with Signature; and (5) special damages proximately caused as a result of the publication. *Salit*, 742 So. 2d at 388; *Bothman v. Harrington*, 458 So. 2d 1163, 1168 (Fla. 3d DCA 1984).[69]

---

[68]"The Restatement of (Second) Torts, Section 623A, recognizes that while an action for injurious falsehood is similar to defamation in that both involve 'the imposition of liability for injuries sustained through publication to third parties of a false statement affecting the plaintiff,' the two torts protect different interests.  The defamation action protects the personal reputation of the injured party, while an action for injurious falsehood protects economic interests of the injured party against pecuniary loss."  *Callaway Land & Cattle Co., Inc. v. Banyon Lakes C. Corp.*, 831 So.2d 204, 209 (Fla. 4th DCA 2002).

[69]*See also Lehman v. Goldin*, 36 So. 2d 259, 260 (Fla. 1948) ("One who, without privilege to do so, publishes matter which is untrue and disparaging to another's property, in land, chattels or intangible things under such circumstance as would lead a reasonable man to foresee that the conduct of a third person as purchaser or lessee thereof might be determined thereby is liable for pecuniary loss

In their Motion, Soares and the County make five arguments with respect to Signature's Injurious Falsehood claim. First, they contend that Soares is entitled to 'absolute immunity' because statements "made by a prosecutor to the press are considered intimately associated with the judicial phase of the criminal process and are thus entitled to absolute immunity." (Doc. 161 at 19). Second, they contend that the County cannot be held liable for injurious falsehood absent a "policy or custom" and cannot be liable under a theory of *respondeat superior*. (Doc. 161 at 19). Third, Soares and the County contend that Signature's Injurious Falsehood claim is "disingenuous" because Plaintiffs themselves "embraced scandalous information" as a means of increasing sales. (Doc. 161 at 20). Fourth, they contend that "the sealed grand jury indictments, serving as the basis for the arrest warrants for plaintiffs, negate the element of falsehood required to sustain a claim of injurious falsehood." (Doc. 161 at 21).[70] And fifth, Soares and the County contend that "any statements were true, based upon the criminal indictments and such truth constitutes a defense. . . ." (Doc. 161 at 22).

Contrary to Soares' statement of the law, a prosecutor's statements to the press are clearly *not* "intimately associated" with the judicial phase of the criminal process. *Fitzsimmons*, 509 U.S. at 277-78 ("Comments to the media have no functional tie to the judicial process").[71] With respect

_____

resulting to the other from the impairment of vendibility thus caused") (internal quotation and citation omitted).

[70]Soares and the Albany D.A.'s Office also argue that "[w]here the alleged torts of defamation and injurious falsehood substantially overlap, and the basis for the claims are predicated upon duplicated damages, no action may be brought in the same suit for both torts." (Doc. 161 at 21, relying on Georgia law). This Court, applying Florida law, has rejected that contention. *See Leavitt v. Cole*, 291 F. Supp. 2d 1338, 1342 (M.D. Fla. 2003) ("The claim of injurious falsehood traditionally involves damage to a property interest, while the claim of slander involves damage to a person's personal reputation. Although closely related, these claims may meaningfully be distinguished") (Presnell, J.).

[71]Soares relies exclusively on federal notions of "absolute immunity" in his Motion, (Doc. 161 at 7 and 19), and does not cite to, or rely on, any state law or privilege providing common law

to the Albany D.A.'s Office, the County also misstates the law: in New York, a plaintiff need not allege a "policy or custom" pursuant to *Monell*, 436 U.S. 658, to assert a common law claim against a municipality; New York municipalities can be held liable for intentional torts under a theory of *respondeat superior*.[72] As for the putatively "disingenuous" character of Plaintiffs' Injurious Falsehood claim, the Court does not grant summary judgment simply because a party believes a claim is "disingenuous."[73] Soares' and the County's contention that the grand jury indictments "negate" the falsity of their statements is without merit. Simply put, Signature was never indicted (and, even assuming that it had been indicted, the New York Defendants have not identified any New York case or Florida case law in which a grand jury indictment insulated a prosecutor from his own false or misleading extrajudicial statements to the press). Finally, there are disputed issues of material fact as to the truth or falsity of Soares' and the Albany D.A.'s Office's statements to third-parties.

Upon review, Soares' and the County's Motion will be denied as to Signature's Injurious Falsehood claim in Count VIII.

### E. Count IX – Defamation Under Florida Common Law

Defamation of a private person has five elements under Florida law: (1) publication to a third party; (2) a false statement; (3) fault, amounting to at least negligence, in the making of the

---

immunity to prosecutors for statements made to the press. In addition, then, to misstating federal law, Soares' reliance on § 1983 "absolute immunity" is inapposite.

[72] *See, e.g.*, *Ferlito v. County of Suffolk*, Case No. 06-5708, 2007 WL 4180670, at *3 (E.D.N.Y. Nov. 19, 2007) (concluding that notice of claim was "sufficient to allege liability on the part of Suffolk County on the basis of respondeat superior . . . for those state causes of action specified in the notice, i.e., assault, battery, false arrest, *defamation*, intentional infliction of emotional distress, use of excessive force, and malicious prosecution) (emphasis added).

[73] To the extent Plaintiffs' own statements in the press or the criminal proceedings somehow improved Signature's business, that is a matter of damages involving disputed issues of material fact which must be resolved at trial.

publication; (4) actual damages; and (5) a defamatory statement. *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008); *see also*, *e.g.*, *Thomas v. Jacksonville Television, Inc.*, 699 So. 2d 800, 803 (Fla. 1st DCA 1997) (citations and quotations omitted).

In their Motion, Soares and the Albany D.A.'s Office simply incorporate all of their previously arguments regarding Signature's Injurious Falsehood claim and contend that they are entitled to a judgment on Plaintiffs' Defamation claim. (Doc. 161 at 18-23).

For the reasons in Part IV, D, *supra*, Soares' and the Albany D.A.'s Office's Motion will be denied as to Plaintiffs' Defamation claim in Count IX.

### F. Count X – Conspiracy to Intentionally Inflict Emotional Distress Under Florida Common Law

To establish a claim for intentional infliction of emotional distress under Florida law, Plaintiffs must prove: (1) deliberate or reckless infliction of mental suffering; (2) outrageous conduct; (3) emotional distress caused by the conduct; and (4) severe distress. *E. Airlines, Inc. v. King*, 557 So. 2d 574, 575-76 (Fla. 1990); *Liberty Mut. Ins. Co. v. Steadman*, 968 So. 2d 592, 594 (Fla. 2d DCA 2007); *see also Metropolitcan Life Ins. Co. v. McCarson*, 467 So. 2d 277, 278-79 (Fla. 1985). In addition:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that this conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one is which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"[74]

*E. Airlines, Inc.*, 557 So. 2d at 576.

---

[74]Whether conduct is outrageous enough to support a claim of intentional infliction of emotional distress is a matter of law – not a question of fact. *Gandy v. Trans World Computer Tech. Group*, 787 So. 2d 116, 119 (Fla. 2d DCA 2001).

To show that the New York Defendants conspired to intentionally inflict emotional distress, Plaintiff must prove: (1) an agreement between the New York Defendants (2) to intentionally inflict emotional distress upon Plaintiffs; (3) the doing of some overt act in pursuance of the conspiracy; and (4) damage to Plaintiffs as a result of the acts performed pursuant to the conspiracy. *See*, *e.g.*, *Patten v. Daoud*, 12 So. 2d 299, 301 (Fla. 1943); *Rivers v. Dillards Dep't Store, Inc.*, 698 So. 2d 1328, 1333 (Fla. 1st DCA 1997); *Kilgore Ace Hardware, Inc. v. Newsome*, 352 So. 2d 918, 920 (Fla. 2d DCA 1977).

The New York Defendants' Motion as to Plaintiffs' Conspiracy to Intentionally Inflict Emotional Distress claim will be granted. To the extent that Plaintiffs purport to rely on the New York Defendants' defamatory statements as outrageous conduct, the Court agrees that, as a matter of law, Plaintiffs cannot transform their defamation claim into a claim for intentional infliction of emotional distress. *See Fridovich v. Fridovich*, 598 So. 2d 65, 70 (Fla. 1992). Moreover, the Court cannot conclude as a matter of law that, *inter alia*, Haskins' conduct in targeting the "girl with the big tits" – coupled with his other conduct during the flight to Albany – would lead an average member of the community to exclaim "Outrageous!" Vulgar and boorish, yes, but not sufficiently egregious as to meet the extremely high threshold necessary to sustain this tort claim.

Accordingly, the New York Defendants' Motion will be granted as to Count X.

## V.  Conclusion

For the foregoing reasons, it is **ORDERED** and **ADJUDGED** that:

1.  Defendants', P. David Soares, Christopher P. Baynes and the Albany County District Attorney's Office, Motion for Summary Judgment (Doc. 161) is **GRANTED** in part and **DENIED** in part;

2.  Defendants P. David Soares, Christopher P. Baynes and Albany County, New York are entitled to a judgment as a matter of law on Plaintiffs' Conspiracy to Intentionally Inflict Emotional Distress claim in Count X of the Amended Complaint; and

3.  In all others respects, Defendants', P. David Soares, Christopher P. Baynes and the Albany County District Attorney's Office, Motion for Summary Judgment (Doc. 161) is **DENIED**.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on June 30, 2010.

Copies furnished to:

Counsel of Record
Unrepresented Party

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE